OPINION
{¶ 1} Plaintiff-appellant, Reginald A. Cooke, appeals from a judgment of the Franklin County Court of Common Pleas that denied Cooke's motion for partial summary judgment and granted a motion for summary judgment filed by defendants-appellees, United Dairy Farmers, Inc. ("UDF") and its Chief Operating Officer and General Counsel, Brian P. Gillan, in this action alleging defamation and conspiracy. For the reasons stated below, we affirm.
 {¶ 2} In 1995, while represented by attorney Daniel Klos, Maude Williams and her son, Michael Williams, filed an employment discrimination complaint with the Ohio Civil Rights Commission ("OCRC"). Previously employed at the Frebis Avenue UDF store, the Williamses alleged that UDF had terminated their employment on the basis of race and not because of violations of the company's money-handling procedures, as UDF maintained.
 {¶ 3} In support of their claim, the Williamses presented testimony by the store's assistant manager, Patty Munyan, who averred that UDF had a discriminatory policy, and that UDF district supervisors, Glenn Broersma and Bill Bales, had directed Munyan and store manager Debbie Ferguson to discriminate against the Williamses. In 1996, when the Williamses' new attorney, Cooke, filed civil actions in federal court based upon the racial discrimination allegations, Cooke intended to call Munyan as a witness for the plaintiffs.
 {¶ 4} However, before that case proceeded to trial, Munyan's boyfriend, Warren Freeman, approached UDF with a videotape of Munyan admitting that she had fabricated her story because she hoped to obtain payment from the Williamses. UDF paid Freeman $10,000 for the tape, and, in June 1998, held a press conference during which Gillan showed the tape and distributed copies of the tape and a transcript of its contents to members of the press. In addition, attorney Larry James, who was outside trial counsel for UDF, attended the conference and fielded reporters' questions regarding the case.
 {¶ 5} During the press conference, Gillan accused Cooke and the Williamses of attempting to extort settlement money from UDF. A transcript of Gillan's press conference statements reads, in part:
In December, 1996, as part of their efforts to force the company to settle these claims, the Williamses and their attorney organized two days worth of virtually nonstop public demonstrations in Columbus and Cincinnati, featuring the appearance of national civil rights leader Reverend Jesse Jackson. The company was vilified for its alleged employment discrimination policies in general. However, very specific and very public demands were made for the company to settle the lawsuit for a monetary payment. It was made very clear that removing the sanctions against the company — which shortly thereafter included an organized boycott and picketing — were contingent upon agreeing to this financial demand. As we will see shortly, getting that money was the critical motivating goal.
Additional pressure was brought to bear on the company when several other employees or former employees filed claims with various local, state and federal agencies claiming discrimination by the company. Six individuals filed discrimination charges with the Columbus Community Relations Commission. There was one common link in all of those filings — attorney Reggie Cooke represented all of those individuals.
Each of these developments also featured massive publicity efforts by Mr. Cooke, complete with inflammatory rhetoric that invoked the worst racial images — all in an effort to make the company reach a financial settlement of the $17 million lawsuits.
 {¶ 6} After showing the videotape to those gathered at the press conference, Gillan stated, in part:
Let's review some of the key points we have just heard and seen.
* * *
Ms. Munyan rationalized why it was okay for her to lie:
"Well, at the time that I did it I thought I was doing the right thing and I thought a little lie wouldn't hurt. I didn't know it was going to be all this. Because when I talked to Reggie (Cooke) and them about it they said, Oh, they'll settle quick."
As that segment reveals, the Williamses' attorney — Mr. Cooke — was a key part of this scheme. She also had this to say about him:
"Well, he told me he was going to make me rich, but I ain't seen no money yet."
Ms. Munyan described why she was living in the apartment and her dissatisfaction with it:
"That's the only reason I'm here, the Williams stuff. He's (Reggie Cooke) afraid I'm going to go someplace else and he won't have me for the case. * * * Then Reggie got me this apartment the other day and told me that — to be ready to go to court. I'm pretty sure it's in July. They'll go to court the only thing that's going to happen is they're going to get their money and expletive Patty. That's how it's gonna be.
* * *"
It is clear from this tape that Ms. Munyan has willingly participated in a gigantic fraud against United Dairy Farmers, the judicial system, and the people of Columbus. This fraud was cast in phony racial discrimination language because she, the plaintiffs and their attorney all thought that would be an easy way to force money from the company. Had we settled the case, as we were repeatedly pressured and threatened to do, they would have gotten away with it. Today, their fraud has been unmasked.
As a result of these developments, we have taken the following steps:
• Motions have been filed in United States District Court supplementing our previous request to find in favor of United Dairy Farmers and dismiss the actions against the company.
• Those motions also request legal sanctions against the Williamses and their attorney, Reggie Cooke, for their gross abuse of the judicial system.
• We also have asked that the Court order the plaintiffs and their attorney to pay the attorneys' fees and other expenses that United Dairy Farmers has incurred as a direct result of the knowingly false claims that were made against the company.
• The videotape evidence of Ms. Munyan's admission that she lied has been delivered to the City Attorney's office to help show that any action against the former store manager, Colleen Cheadle, should be dismissed.
• Ms. Munyan's admitted perjury has been brought to the attention of appropriate legal authorities so they can determine if she should be prosecuted for her role in these matters.
 {¶ 7} In September 1998, as part of its defense in the federal court case, UDF presented the videotape and related arguments to the jury, which found in favor of UDF and related parties. See Williams v. UnitedDairy Farmers (1999), 188 F.R.D. 266.
 {¶ 8} In 1999, Cooke sued UDF, Gillan, James, and James' law firm, Crabbe, Brown, Jones, Potts and Schmidt, for defamation and related causes. In his complaint, Cooke objected to Gillan's statements during the press conference, specifically protesting that:
27. Gillan stated to the members of the media gathered at the event that "the attacks against UDF over the last 1 and 1/2 years are false" and that they "were a part of an unethical and illegal scheme to get money from the company."
28. Next Gillan stated that Cooke "cynically helped orchestrate this campaign for his own financial gain, fanned the flames with his racial rhetoric to force the company to settle these bogus claims."
29. Gillan then falsely placed Cooke back in time to 1995, — the period when the plotting of the alleged illegal scheme between Munyan and Maudie Williams occurred. Gillan said "approximately three years ago * * * Ms. Williams and her son — who now were represented by attorney Reginald Cooke — filed charges with the Ohio Civil Rights Commission."
30. After stating that Munyan was involved in a scheme to lie for money, Gillan added that "the Williamses' attorney — Mr. Cooke — was a key part of this scheme."
 {¶ 9} In addition to these claims regarding Gillan's speech at the press conference, Cooke's complaint also charged defamation in Gillan's distribution of written materials containing identical allegations against Cooke.
 {¶ 10} In Count 31, Cooke accused James of defamation based upon James' comments regarding a duty to report Cooke's alleged wrongful conduct to the Office of the Disciplinary Counsel for the Supreme Court of Ohio. Presented with a separate motion for summary judgment by James and his law firm, the trial court granted summary judgment in favor of those two defendants in June 2002. The court found that James' comment was a statement of opinion and so was protected, and that Cooke produced no evidence that James conspired with UDF or Gillan to defame Cooke or from which James or his firm could be held liable for UDF/Gillan statements.
 {¶ 11} In Cooke v. United Dairy Farmers, Franklin App. No. 02AP-781, 2003-Ohio-3118 ("Cooke I"), this court reversed in a split decision, determining that the evidence suggested that James helped plan and participated in the press conference, and that he filed federal court documents that morning containing virtually the same allegations as those raised in the press conference. Thus, we held that a question of fact remained as to whether James was sufficiently involved in preparing for and holding the press conference that he could be held liable along with UDF and Gillan for any defamatory content. Addressing James' statement during the press conference that he had an obligation to report Cooke's conduct to the Ohio Supreme Court's Disciplinary Counsel, we found that, because James used language that was value laden and represented a subjective viewpoint, James was expressing an opinion that was constitutionally protected. However, because we found that participation in the conference exposed James to liability for any defamatory statements by Gillan and UDF, we reversed summary judgment in favor of James and his firm, and remanded the matter for further determination by the trial court.[1]
 {¶ 12} Regarding Cooke's claim against UDF and Gillan, in July 2004, the trial court issued its decision and entry denying Cooke's motion for partial summary judgment and granting UDF and Gillan's motion for summary judgment. In its decision, the court:
 {¶ 13} 1. Agreed with Cooke that the spoken and written words by UDF and Gillan constituted defamation per se because the accusation that Cooke asked a witness to testify falsely would tend to injure Cooke in his occupation as an attorney, who, as an officer of the court, is sworn to uphold the law.
 {¶ 14} 2. Found, however, that UDF and Gillan are entitled to a qualified or conditional privilege because their statements involved a matter of public concern, the publication was in good faith, and they had a legal and ethical obligation to expose potential attorney misconduct.
 {¶ 15} 3. Held that Cooke was unable to establish actual malice because, at the time of the press conference, UDF and Gillan had a subjective belief that Munyan was telling the truth on the tape, thus, they would not have been aware of a high probability of falsity of their statements.
 {¶ 16} 4. Determined that Cooke's conspiracy claim was unsupported because there was no basis for an underlying claim of defamation.
 {¶ 17} Cooke now raises the following assignments of error:
Assignment of Error No. 1
The trial court erred by granting summary judgment in favor of defendants-appellees United Dairy Farmers, Inc. and Gillan on grounds of an affirmative defense which defendants-appellees never asserted in this action.
Assignment of Error No. 2
The trial court's decision and entry granting appellees' motion for summary judgment is in direct conflict with this court's previous opinion and mandate in this case, and is accordingly in error.
Assignment of Error No. 3
The trial court erred in its decision sustaining defendants' motion for summary judgment as to plaintiff's defamation claims because genuine issues of material fact existed and appellees were not entitled to judgment as a matter of law on grounds of the unpleaded defense of qualified privilege.
Assignment of Error No. 4
The trial court erred in its decision sustaining defendant[s]-appellees' motion for summary judgment as to plaintiff's conspiracy claim because genuine issues of material fact existed and appellees were not entitled to judgment as a matter of law.
Assignment of Error No. 5
The trial court erred in its decision overruling plaintiff-appellant's motion for partial summary judgment.
 {¶ 18} Appellate review of summary judgment motions is de novo. Heltonv. Scioto Cty. Bd. of Commrs. (1997), 123 Ohio App.3d 158, 162. "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." Mergenthal v. Star Banc Corp. (1997),122 Ohio App.3d 100, 103. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. State ex rel. Grady v. State Emp.Relations Bd. (1997), 78 Ohio St.3d 181, 183.
 {¶ 19} When proper evidence supports a motion for summary judgment, a non-moving party may not rest on the mere allegations of his pleading, but his response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing a genuine triable issue. Civ.R. 56(E); Jackson v. Alert Fire Safety Equip., Inc. (1991),58 Ohio St.3d 48, 52. To establish the existence of a genuine issue of material fact, the non-moving party must do more than simply resist the allegations in the motion. Rather, that party must affirmatively set forth facts entitling him to relief. Wing v. Anchor Media, Ltd. of Texas
(1991), 59 Ohio St.3d 108, 111. If the non-moving party "does not so respond, summary judgment, if appropriate, shall be entered against the party." Civ.R. 56(E).
 {¶ 20} Pursuant to Section 11, Article I of the Ohio Constitution: "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press." The Ohio Supreme Court has recognized that the Ohio Constitution protects expressions of opinion as a valid exercise of freedom of the press. Scottv. News-Herald (1986), 25 Ohio St.3d 243, 244-245.
 {¶ 21} In Vail v. The Plain Dealer Publishing Co. (1995),72 Ohio St.3d 279, 281-282, the court applied a totality of the circumstances test for determining whether speech is protected opinion, stating that a court should consider "the specific language at issue, whether the statement is verifiable, the general context of the statement, and the broader context in which the statement appeared." Id. at syllabus. Thus, in Vail, where the statements were made in a column labeled "commentary" and printed on the Forum page of the newspaper, the reader would have received the message that the statements were opinion. In addition, the court looked at whether the column was characterized as objective facts or subjective hyperbole, and concluded the "general tenor of the column" was "sarcastic, more typical of persuasive speech than factual reporting." Id. at 282. The court analyzed the specific language to determine "whether a reasonable reader would view the words used to be language that normally conveys information of a factual nature or hype and opinion." Id. Finally, the court looked at whether the statements were verifiable, asking whether the author implied that he had first-hand knowledge that substantiated his opinions. Quoting Scott, the court stated that, where the statement lacks a plausible method of verification, the reasonable reader will not believe the statement has specific factual content. Id. at 283.
 {¶ 22} In Jorg v. Cincinnati Black United Front, 153 Ohio App.3d 258,2003-Ohio-3668, the First District Court of Appeals applied Vail's
totality of the circumstances test to a defamation suit in which the plaintiff claimed that members of a civil rights organization had falsely accused police of "killing, raping, [and] planting false evidence." Id. at ¶ 4. The court in Jorg recognized that, even though the statements were unambiguous and could be interpreted as facts, and additionally were verifiable and capable of proof, the context of the statements militated against a finding of actionable defamation:
Considering the allegedly defamatory statements in the context of the entire letter, we are convinced that the average reader would be unlikely to infer that the statements were meant to be factual. The entire letter was a call to action and meant to cause outrage in the reader. * * *
With the letter viewed as a whole, it is obvious that it was meant to be persuasive. As the trial court concluded, it was advocacy, not objective news. The letter was seeking support for "travel and tourism sanctions against the Cincinnati area" and clearly stated this purpose in bold type in the first paragraph. * * * [T]he average reader viewing the allegedly defamatory words in the context of the entire letter would have been hard-pressed to accept [the] statements as impartial reporting. We conclude that, under this factor, the statements would most likely be regarded as opinion, not fact * * *.
Id. at ¶ 20-21.
 {¶ 23} In this matter, Cooke specifically objects to several statements. First, Count 27 of his complaint charges defamation in Gillan's statements that "the attacks against UDF over the last 1 and 1/2 years are false" and that they "were a part of an unethical and illegal scheme to get money from the company." The language describes Cooke's actions against UDF as "attacks," and refers to the plan as a "scheme" that is described as "unethical and illegal," all value-laden words. By using the word "attacks" instead of "charges," "scheme" instead of "plan," and "unethical and illegal" instead of merely "improper" or "objectionable," Gillan added rhetorical hyperbole that would suggest to the listener that this is UDF's and/or Gillan's interpretation of Cooke's conduct. Similarly, Count 28 of the complaint finds fault with Gillan's statement that Cooke "cynically helped orchestrate this campaign for his own financial gain, fanned the flames with his racial rhetoric to force the company to settle these bogus claims." Gillan's choice of words and phrases like "cynically," "fanned the flames" and "bogus" suggests opinion because these words are intended to express UDF's outrage at being, as Gillan put it, the victim of a "gigantic fraud." Thus, these statements were also clearly opinion.
 {¶ 24} In addition, the statements are not verifiable. Statements lacking a plausible method of verification are more obviously opinion because they do not rest upon either implied or explicit fact. See Conditv. Clermont Cty. Review (1996), 110 Ohio App.3d 755, 760-761. Finally, viewed in the broader context of Gillan's stated purpose for the press conference — to counter the negative publicity engendered by the Williamses' claims of racial discrimination by publicly presenting exculpatory evidence — Gillan clearly considered himself to be "fighting fire with fire" by attempting to try the case in the court of public opinion. As we stated in Cooke I, at ¶ 42: "The broader context of the statement was the press conference in which UDF was defending itself in the media against claims of racial discrimination, and accusing Cooke of orchestrating a campaign based on fabrications." Considering all of the surrounding circumstances, we find that the statements contained in Counts 27 and 28 of Cooke's complaint were clearly Gillan's opinion, and not actionable defamation.
 {¶ 25} In Count 30, Cooke points to Gillan's statement that Cooke was "a key part" of Munyan's scheme to lie for money, a statement that is not verifiable, because both Cooke and UDF could have been unwitting victims of Munyan's plan to lie to the highest bidder. Moreover, in the context of the entire press conference, which was expressly intended to persuade the public that UDF was innocent of the racial discrimination charges lodged against it, Gillan's statement that Cooke was a "key part" of Munyan's scheme would be interpreted by the average listener as UDF and Gillan's opinion that Cooke knew Munyan had lied. Thus, the statement contained in Count 30 also was not actionable defamation.
 {¶ 26} In Count 29, Cooke complains that Gillan falsely linked Cooke to the Williamses as early as their filing of the complaint before the Ohio Civil Rights Commission in 1995, a period during which Cooke did not represent the Williamses. Gillan said, "approximately three years ago * * * Ms. Williams and her son — who now were represented by attorney Reginald Cooke — filed charges with the Ohio Civil Rights Commission."
 {¶ 27} The statement that Cooke represented the Williamses during their initial complaint before the OCRC does not qualify as opinion. First, court or other records demonstrate when, in fact, Cooke's representation began. Thus, the statement is verifiable. In addition, the immediate context in which that statement was made suggests Gillan intended it to be taken as fact. This segment of the transcript of the press conference reads:
We need to go back in time to get the perspective that is needed to understand the importance of today's evidence and the reasons why it topples the house of cards that has been constructed.
Approximately three years ago, two former employees of the United Dairy Farmers store at Frebis and Fairwood were fired for "violating company cash-handling procedures." These two individuals — Maudie Williams and her son Michael Williams — had previously received warnings concerning their conduct on the job. They admitted — in writing — that they had not followed explicit procedures developed to ensure that the cash at the store is safeguarded. Both Ms. Williams and her son are African-American, but they made no claim at the time that their termination was racially motivated.
After several months had passed, both Ms. Williams and her son — whonow were represented by attorney Reginald Cooke — filed charges with the Ohio Civil Rights Commission. Two different investigators were assigned to the charges and the agency essentially reached split decisions on what amounted to the same evidence in each case.
The Williamses and their attorney next filed two lawsuits in federal court seeking approximately $17 million in damages. They claimed that their employment had been terminated because of their race rather than due to their admitted violations of company procedures.
(Emphasis added.)
 {¶ 28} The statement appeared amid factual, verifiable information explicitly intended to give the listener a history of the Williamses' case against UDF. All of the statements immediately surrounding the assertion that Cooke represented the Williamses at the time of the OCRC action were factual, or, at least, capable of verification. Thus, the listener would have inferred that the statement about Cooke also was factual. Moreover, as the court recognized in Wampler v. Higgins (2001),93 Ohio St.3d 111, 131, quoting Ollman v. Evans (C.A.D.C. 1984),750 F.2d 970, 983, "`some types of writing or speech by custom or convention signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.'" While other statements during the press conference clearly implied that Gillian was conveying opinion, this statement did not send that signal.
 {¶ 29} Thus, we conclude that the statement that Cooke represented the Williamses in their action before the OCRC was not opinion.
 {¶ 30} In Cooke I, we stated, at ¶ 24:
Defamation, which includes both libel and slander, is a false publication causing injury to a person's reputation, exposing the person to public hatred, contempt, ridicule, shame, or disgrace, or affecting the person adversely in his or her trade or business. Knowles v. OhioState Univ., Franklin App. No. 02AP-527, 2002-Ohio-6962; Sweitzer v.Outlet Communications, Inc. (1999), 133 Ohio App.3d 102, 108 * * *. To establish defamation, a plaintiff must show: (1) the defendant made a false statement, (2) the statement was defamatory, (3) the statement was published, (4) the plaintiff was injured as a result of the statement, and (5) the defendant acted with the required degree of fault. Sweitzer,
supra.
 {¶ 31} The evidence before the trial court demonstrates the falsity of Gillan's statement that Cooke represented the Williamses at the time of the OCRC proceedings. Supporting as it does UDF and Gillan's contention that Cooke knowingly pursued false charges of racial discrimination against UDF, the statement would tend to injure Cooke in his trade, and so was defamatory. There is no dispute that the statement was published. However, Cooke's evidence has failed to raise a genuine issue of fact as to whether UDF and Gillan acted with the required degree of fault.
 {¶ 32} "A limited-purpose public figure is one who becomes a public figure for a specific range of issues by being drawn into or voluntarily injecting himself into a specific public controversy." Featherstone v. CMMedia, Inc., Franklin App. No. 02AP-65, 2002-Ohio-6747, at ¶ 27, following Gertz v. Robert Welch, Inc. (1974), 418 U.S. 323. To determine whether a person is a limited-purpose public figure, we must examine (1) the person's participation in the controversy from which the alleged defamation arose; and (2) whether that person has attained a general notoriety in the community as a result of that participation. Talley v.WHIO TV-7 (1998), 131 Ohio App.3d 164, 170. If an individual is a limited-purpose public figure, courts apply the same standard of proof for defamation as was set forth in New York Times Co. v. Sullivan
(1964), 376 U.S. 254. In other words, to prove defamation, a public-figure plaintiff must show "actual malice" on the part of the defendant in publishing the false statement, and must do so by clear and convincing evidence. Id.; Gertz at 342.
 {¶ 33} The facts in this case demonstrate that Cooke was a limited-purpose public figure. First, he participated in the controversy from which the defamation arose.
 {¶ 34} Cooke's deposition describes at length the efforts he made to publicize the allegations of racial discrimination lodged against UDF. He held multiple press conferences, fielded telephone calls from the media asking him to comment on the case, appeared on radio programs and at community organization meetings, and obtained the assistance of Reverend Jesse Jackson, a nationally-known figure whose support immediately attracted the attention of the national news media. As a result of these publicity efforts, Cooke attained a general notoriety in the community.
 {¶ 35} Based upon these facts, we find that Cooke was a limited-purpose public figure. Therefore, in order to prevail on his defamation claim, he had to show, by clear and convincing evidence, that UDF and Gillan acted with actual malice in stating that he represented the Williamses at the time of their initial complaint before the OCRC.
 {¶ 36} A statement is made with "actual malice" where the publisher knew that the statement was false or had a reckless disregard of whether it was false or not. Burns v. Rice, 157 Ohio App.3d 620, 2004-Ohio-3228, at ¶ 22, citing New York Times. Here, to establish reckless disregard, Cooke had to present clear and convincing evidence that, at the time of publication, UDF and Gillan's false statement was made with a high degree of awareness of its falsity. Id. Thus, we look to the evidence before the trial court to determine whether there was evidence that Gillan knew Cooke was not the Williamses' counsel at the time of the OCRC complaint. In his deposition, Gillan testified that his interpretation of various statements by Munyan on the videotape led him to conclude that Munyan was referring to Cooke as the attorney who was assisting the Williamses at the time of the OCRC proceedings. The following exchange occurred:
Q. I think from the fact sheet, that we're all pretty sure that it was March of 1995 that Maudie and Michael Williams filed charges with the Ohio Civil Rights Commission; correct?
A. Correct. But you have to understand for the process and my understanding of what I heard on the videotape, I was not relating it to simply the filing of charges. The OCRC process took several years.
Early on in that process Mr. Cooke made an appearance. I understood Ms. Munyan in the videotape to be referring to her testimony during that process. She was deposed at least once. So my understanding was not simply that it related in time to March of '95.
* * *
Q. So you knew that Patty Munyan had given a statement describing, in essence, a racially-hostile environment at the Frebis store prior to the time that Reginald Cooke commenced representation of the Williamses; correct?
A. Well, no. Again, as I testified this morning, I was not at all clear exactly when Reggie Cooke began representing the Williamses.
Q. So what you're telling me is that you thought that Reginald Cooke might have begun representing the Williamses before he sent you a letter telling you that he was representing the Williamses; is that correct?
A. Yes.
Q. Did you have any reason to believe that Reginald Cooke had begun to represent the Williamses before he said he was representing the Williamses?
A. Well, at the time what I knew was there was, to my mind, confusion around who exactly represented the Williamses. Mrs. Williams had apparently identified Dan Klos. Dan Klos had disavowed a — at least a formal representational arrangement. Reggie Cooke had, within a week or so after I received something from the OCRC on which Dan Klos was copied, sent a letter making his own demand; so when exactly his representation began, I did not know and I do not know to this day.
Q. Were you in the possession of any information whatsoever that suggested to you that Reginald Cooke was representing the Williamses prior to the conclusion of the OCRC investigation?
* * *
A. My state of knowledge as of February 1996 is as I've testified to a couple of times, but I did not think of the OCRC process as having terminated with the issuance of a complaint or the conclusion of the evidence of the charge. It simply went to another level; that is, issuance of the complaint and then litigation around the complaint. So at some point in there Reggie Cooke was involved, but I didn't tie it to any particular action by the OCRC. (Depo. at 101-102, 106-108.)
 {¶ 37} Based upon these statements, we find that Cooke failed to raise a genuine issue of material fact as to whether Gillan acted with actual malice in stating that Cooke represented the Williamses at the time of the OCRC complaint. Gillan's deposition does not reveal that he was aware his statement was false at the time he made it. Because Cooke's evidence does not support a finding of actual malice, he cannot prevail on his defamation claim, and the trial court properly concluded that UDF and Gillan were entitled to judgment as a matter of law.
 {¶ 38} We additionally find that, even if Cooke's evidence demonstrated actual malice, there was no evidence of damages. Asked about damages during his deposition, Cooke stated:
A. I filed this claim as a per se defamation for damages I presume. So I will not be presenting evidence about business and credit. I won't be presenting evidence regarding that.
* * *
Q. So how have you been damaged in your business?
A. Let me say that I've been accused by — I've been accused by you and UDF and Larry James, Mr. Gillan of fraud, suborning perjury, of criminal extortion. I can't prove one way or the other whether I've — I can't prove that. All I know is that anyone in my profession, who — an attorney's reputation is his stock in trade, that that type of onslaught will impact him. I can't prove it, I don't have any statistics, I haven't done any research. So that's all I can say.
Q. Has your income gone down as a result of this press conference?
A. I have no information to show that.
Q. What credit were you denied?
A. I have no information on being denied credit.
(Depo. at 183-184.)
 {¶ 39} In summary, we find that most of Gillan's statements qualified as opinion, but his statement regarding the actual time Cooke began representing the Williamses was not opinion but intended to be taken as fact. Nevertheless, because Cooke was a limited-purpose public figure, Cooke had to show that Gillan made the statement with actual malice, meaning with knowledge that the statement was false or with a reckless disregard as to its falsity. Cooke did not raise a genuine issue of fact as to whether Gillan made the statement with actual malice, and even if he did, Cooke had no evidence of damages. Thus, Cooke was not able to overcome the motion for summary judgment.
 {¶ 40} Based upon these considerations, we find the trial court did not err in granting summary judgment in favor of UDF and Gillan, albeit on different grounds. We will now address Cooke's assignments of error.
 {¶ 41} Cooke's first and third assignments of error raise issue with the trial court's determination that, even though some of Gillan's press conference statements constituted defamation per se, these statements were entitled to a privilege, thus UDF and Gillan were not liable. According to Cooke, appellees did not properly raise privilege as a defense and, even if they did, the statements were not privileged. However, we find we need not reach the issue of privilege because of our finding that Gillan's statements either were opinion or, if fact, were not published with actual malice. Therefore, we overrule Cooke's first and third assignments of error as moot.
 {¶ 42} Cooke's second assignment of error asserts that the trial court's decision is in direct conflict with our conclusions in Cooke I.
However, Cooke I did not ultimately establish that any conduct of any of the defendant parties did, in fact, constitute defamation. We stated, at ¶ 37-38:
* * * James' participation in pre-conference discussions, combined with his filing the court document and his presence at the press conference, suggests James was aware of the substance of the press conference, agreed to the common understanding, filed a document in court reflecting the common understanding, and participated in the conference with that understanding.
We readily acknowledge that our determination of Cooke's assignment oferror does not indicate Cooke ultimately will prevail. Rather, wedetermine only that the facts the parties presented create a genuineissue of material fact for the jury to resolve.
(Emphasis added.)
 {¶ 43} In Cooke I, we simply stated that Cooke had presented sufficient evidence to survive summary judgment. Cooke I is not "the law of the case" on the issue of whether Cooke is a limited-purpose public figure or on whether Cooke presented clear and convincing evidence of actual malice. Therefore, we overrule Cooke's second assignment of error.
 {¶ 44} Cooke's fourth assignment of error argues that the trial court should have denied UDF/Gillan's motion for summary judgment on Cooke's conspiracy claim. As we stated in Cooke I, at ¶ 26, civil conspiracy is "`a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'" Id., quoting Kenty v. TransAmerica Premium Ins. Co.
(1995), 72 Ohio St.3d 415, 419. As noted by the trial court, a claim of civil conspiracy derives from and depends upon the plaintiff's successful prosecution of the underlying claim for defamation. Burns at ¶ 56. Because we find that Cooke's defamation action fails, so does his conspiracy claim. Therefore, we overrule Cooke's fourth assignment of error.
 {¶ 45} Cooke's fifth assignment of error charges that the trial court erred in overruling his motion for partial summary judgment, by which he sought a finding that statements made during the press conference were defamation per se. By this assignment of error, Cooke essentially reiterates his other arguments that privilege was not properly pled, and that the evidence supported his defamation claim, thus he was entitled to partial summary judgment because no genuine issue of fact remained for trial. Based upon our disposition of the case, we find this argument not well-taken, and we overrule Cooke's fifth assignment of error.
 {¶ 46} Having overruled Cooke's five assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Petree and McGrath, JJ., concur.
[1] The record currently before us does not disclose any further action on remand as to Cooke's complaint as to James and his law firm.