OPINION
{¶ 1} Charles S. Spingola, plaintiff-appellant, appeals from the judgments of the Franklin County Court of Common Pleas, in which the court granted the motion for summary judgment filed by Sinclair Media, II, Inc. (individually "Sinclair Media"), WSYX-TV6 (individually "TV6"), and Tram Mai (collectively "Sinclair"), defendants-appellees; the motion for summary judgment filed by Outlet Broadcasting, Inc. (individually "Outlet Broadcasting"), WCMH-TV4 (individually "TV4"), and Leslie Siegel (collectively "Outlet"), defendants-appellees; and the motion to dismiss filed by city of Columbus, Janet Jackson, and Scott Varner (collectively "the City"), defendants-appellees.
 {¶ 2} On June 23, 2001, the 2001 Columbus Pride Parade was held in downtown Columbus, Ohio. Appellant attended the parade, and, at some point, appellant announced his intent to light a flag on fire. Several news reporters and photographers gathered. Included in the news media was Leslie Siegel, a reporter for TV4, which is owned by Outlet Broadcasting, and Tram Mai, a reporter for TV6, which is owned by Sinclair Media.
 {¶ 3} With the photographers filming and the other media standing nearby, appellant requested a canister from an associate, Tom Meyer. A flammable liquid was then poured from the canister onto the flag. Andrea Critchet, a security officer, claimed appellant doused her with the liquid when it was poured. Appellant announced to bystanders and city of Columbus police officers that he was going to light the flag on fire, and one officer told him not to do it. Appellant then used a match to light the flag. Appellant was subsequently arrested and taken to a police cruiser. After the flag was extinguished, police beat the arms of several teenage girls who would not release their grasp on the flag. On their 6:00 p.m. and 11:00 p.m. news broadcasts for that same evening, Mai, for TV6, and Siegel, for TV4, broadcast news stories about the flag burning incident involving appellant. Appellant's assignments of error, in part, relate to these broadcasts, and their relevant contents will be discussed in addressing those assignments of error.
 {¶ 4} In August 2001, the city of Columbus filed charges against appellant for assault and aggravated menacing. After the filing, Varner, the Communications Director for the Columbus City Attorney's Office, stated to the media that it had filed charges against appellant, and then explained that the city of Columbus and Jackson, the Columbus City Attorney at that time, had waited to file the charges until Critchet's account could be verified with other witnesses. Appellant was subsequently found not guilty pursuant to a jury trial.
 {¶ 5} On September 23, 2003, appellant filed a complaint against the Sinclair defendants, the Outlet defendants, and the City defendants, alleging defamation. On October 9, 2003, the City filed a motion to dismiss under Civ. R. 12(B)(6), which the trial court granted on September 1, 2005. On September 15, 2004, Outlet filed a motion for summary judgment. On September 24, 2004, Sinclair filed a motion for summary judgment. The trial court granted both motions for summary judgment on April 4, 2006. Appellant appeals the judgments of the trial court, asserting the following assignments of error:
 [I.] THE TRIAL COURT ERRED BY GRANTING THE SINCLAIR DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[.]
 [II] THE TRIAL COURT ERRED BY GRANTING THE OUTLET DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.
 [III] THE TRIAL COURT ERRED BY GRANTING THE CITY DEFENDANTS' MOTION TO DISMISS UNDER CIVIL RULE 12(B)(6).
 {¶ 6} Appellant argues in his first assignment of error that the trial court erred in granting summary judgment to Sinclair on his defamation action. When reviewing a motion for summary judgment, courts must proceed cautiously and award summary judgment only when appropriate. Franks v. The Lima News (1996), 109 Ohio App.3d 408. Civ. R. 56(C) provides that, before summary judgment may be granted, it must be determined that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the non-moving party, that conclusion is adverse to the non-moving party. State ex rel. Howard v. Ferreri (1994),70 Ohio St.3d 587, 589. When reviewing the judgment of the trial court, an appellate court reviews the case de novo. Franks, supra. Summary judgment procedures are particularly appropriate when addressing First Amendment free speech issues in a defamation action. Dupler v. Mansfield JournalCo., Inc. (1980), 64 Ohio St.2d 116, 120.
 {¶ 7} Although freedom of speech is a constitutionally protected state and federal right, the media is not protected when it publishes defamatory statements. Defamation is a false statement published by a defendant acting with the required degree of fault that injures a person's reputation, exposes the person to public hatred, contempt, ridicule, shame or disgrace, or adversely affects the person's profession. A B-Abell Elevator Co., Inc. v. Columbus/Cent. Ohio Bldg.and Constr. Trades Council (1995), 73 Ohio St.3d 1, 7. Generally speaking, defamation can come in two forms: slander, which is spoken; and libel, which is written. See Dale v. Ohio Civ. Serv. Emp. Assn.
(1991), 57 Ohio St.3d 112. The elements of a defamation action, whether slander or libel, are that: (1) the defendant made a false and defamatory statement concerning another; (2) that the false statement was published; (3) that the plaintiff was injured; and (4) that the defendant acted with the required degree of fault. Celebrezze v. DaytonNewspapers, Inc. (1988), 41 Ohio App.3d 343. The entry of summary judgment in a defendant's favor is appropriate in a defamation action if it appears, upon the uncontroverted facts of the record, that any one of the above critical elements of a defamation case cannot be established with convincing clarity. Temethy v. Huntington Bancshares, Inc., Cuyahoga App. No. 83291, 2004-Ohio-1253.
 {¶ 8} In the present case, the trial court found appellant could not prove the fourth element indicated above. Concerning the fourth element, the publisher's required degree of fault varies depending on the status of the plaintiff, ranging from a private individual to a public figure.Gertz v. Welch, Inc. (1974), 418 U.S. 323, 94 S.Ct. 2997. When the plaintiff is a public figure, a successful defamation claim requires clear and convincing evidence that the statement was published with "actual malice." New York Times Co. v. Sullivan (1964), 376 U.S. 254,280, 84 S.Ct. 710. In addition, courts have created a "limited-purpose public figure," which is a plaintiff who becomes a public figure for a specific range of issues from which the person gains general notoriety in the community. Gertz, supra, at 351. A limited-purpose public figure also has to prove that the defamatory statement was made with actual malice. See Kassouf v. Cleveland Magazine City Magazines (2001),142 Ohio App.3d 413. It is undisputed, here, that appellant was at least a limited-purpose public figure for purposes of the present case.
 {¶ 9} To demonstrate actual malice, a plaintiff must prove that the statement was made with knowledge that it was false, or with reckless disregard of whether it was false or not. New York Times, at 280. To establish reckless disregard, the plaintiff must present clear and convincing evidence that the false statements were made with a high degree of awareness of their probable falsity, Garrison v.Louisiana (1964), 379 U.S. 64, 74, 85 S.Ct. 209, or that the defendant in fact entertained serious doubts as to the truth of his publication.St. Amant v. Thompson (1968), 390 U.S. 727, 731, 88 S.Ct. 1323. Whether the evidence in the record supports a finding of actual malice is a question of law. Harte-Hanks Communications, Inc. v. Connaughton (1989),491 U.S. 657, 685, 109 S.Ct. 2678.
 {¶ 10} In St. Amant, the United States Supreme Court discussed the evidence that is required to support a conclusion that a defamation defendant has acted with reckless disregard of the truth or falsity of his or her publication. The court held that "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." Id., at 731. Thus, evidence of the defendant's subjective state of mind is required in order to satisfy the actual malice standard. Id., at 733. However, the ability of defendants to subvert the standard with self-serving testimony is limited. The defendant cannot automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. Id., at 732. The finder of fact must determine whether the publication was indeed made in good faith. Id. A defendant lacks good faith to make a statement shown to be false where there is either no basis in fact for the statement or no information upon which the defendant could have justifiably relied in making the statement. Id. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Id. While the proper standard requires a clear and convincing showing, it can be satisfied by circumstantial evidence of the defendant's state of mind. Citizens to Save Northland v. Ohio ElectionsComm. (Dec. 27, 2001), Franklin App. No. 01AP-115.
 {¶ 11} As this court indicated in Serv. Emp. Internatl.Union Dist. 1199 v. Ohio Elections Comm., 158 Ohio App.3d 769, 2004-Ohio-5662, at ¶ 24, where a statement is supported by some basis in fact, courts have found insufficient evidence of actual malice even if the statement is ultimately found to be untrue. Id., citing St. Amant, at 733 (finding actual malice lacking where the defendant published a source's false statements about a public officer but the defendant had no personal knowledge that the statements were false, had verified other aspects of the source's information, and had affidavits from other sources substantiating the statements); Flannery v. Ohio Elections Comm.,156 Ohio App.3d 134, 2004-Ohio-582 (finding no malice where ultimately incorrect statements were published but the defendant had a factual foundation and an arguably rational basis for making the statements);Mosley v. Evans (1993), 90 Ohio App.3d 633, 638 (finding no malice where some factual foundation existed for statements). Likewise, the United States Supreme Court in Bose Corp. v. Consumers Union of United States,Inc. (1984), 466 U.S. 485, 104 S.Ct. 1949, found clear and convincing evidence of actual malice lacking where the author's statement was one of a number of possible rational interpretations of an event that bristled with ambiguities. Bose Corp., at 512, citing Time, Inc. v.Pape (1971), 401 U.S. 279, 290, 91 S.Ct. 633.
 {¶ 12} With regard to Sinclair, appellant specifically cites two instances of defamation. Appellant argues that Sinclair acted with actual malice when Mai reported on TV6's 6:00 p.m. news broadcast that "violence erupted" with two fights at the parade and that appellant would be "charged with a felony — either aggravated assault or arson." Appellant maintains that the undeniable message conveyed was that he had committed a violent crime, which was false. Appellant asserts that the TV6 broadcasts were such a "mutation of the truth" that actual malice can be inferred from them. In support of his position that Mai acted with actual malice, appellant relies almost solely upon Mai's deposition and affidavit. However, after reviewing Mai's testimony, we find it does not support appellant's contentions.
 {¶ 13} Mai testified she and her photographer, Jeff Ritter, covered the parade for TV6. As they walked along the parade route, Mai heard appellant's voice and went to where he was standing near the intersection of Broad and High Streets, across the street from the Statehouse in downtown Columbus. Mai then interviewed appellant. Immediately after the interview, appellant lit the flag on fire. Mai stated she felt some of the fluid from the container splash on her leg, and she smelled it to identify it. At the time of the event, she never heard anyone say he or she had been splashed with the fluid, including Critchet. Appellant was then immediately arrested.
 {¶ 14} Mai further testified that, besides two girls whose arms were being hit by police officers because they would not let go of the flag after appellant was arrested, she never saw anyone sustain any injuries. She stated that, in the 6:00 p.m. news broadcast, there was a woman, Deborah Fisher, interviewed who stated that the controversy did not ruin the spirit of the parade and that it was not nice to see them "gassing or macing people" with their kids there, and Mai did not know to what the woman was specifically referring and did not associate it with Critchet getting gas splashed on her. Mai believed the comment about the "gassing" referred to the application of the fluid onto the flag and that Fisher may have seen "macing," although Mai had not. Mai did not recall thinking that she was referring to police mace. In her news broadcast, Mai stated that appellant would be charged with a felony — either aggravated assault or arson — and she testified that she received this information in a telephone call from Columbus Police Sergeant Earl Smith, the public information officer, minutes before she went live on the air. She stated she did not know whether the charges were going to be for the flag burning or something else. Mai stated she was given the information from Smith, and she went on the air with it. She changed her broadcast for the 11:00 p.m. show, after Smith called her and corrected the information. She did not say anything in the 11:00 p.m. show to retract the earlier comment about the charges. Mai stated she thought the information given to her from Smith for the 6:00 p.m. show was correct. Mai stated she was aware that the United States Supreme Court had found the burning of the American flag was constitutionally protected free speech, but she did not consider whether appellant's activities were legal. She stated that, at the scene, appellant made it clear that he believed he had a right to burn the flag. Mai stated she considered the flag burning a violent act, in that it was very confrontational. When appellant stated he was trying "to fight them" and was not going "to lay down for these queers trying to get in the minds of children," she viewed this as "fighting" in a confrontational and verbal sense, not a physical sense. She believed there had been a "fight," in that appellant had been in a dispute with others and with the police. She stated appellant did not resist arrest.
 {¶ 15} In her affidavit, Mai averred to the same things included in her deposition testimony. In addition, she stated that, when she saw appellant at the parade, he was yelling loudly and was confrontational. During the course of her interview with him, appellant shouted and protested the parade. Appellant also argued with police over his right to burn the flag prior to burning it, during the burning, and after he burned it. Mai averred there was a "good deal of commotion" around appellant. Mai averred that the "violence" and "disturbance" continued after appellant's arrest, as the police fought with two young girls over the remains of the burnt flag. She called Sergeant Smith, a trusted and reliable source, and she had no reason to doubt the information regarding the potential charges he told her minutes before the 6:00 p.m. broadcast. To the best of her knowledge, everything included in the broadcasts was either true or substantially true to the best of her knowledge, and at no time did she have any reason to doubt any of the information included in the broadcasts. Mai averred that there was no question that, in her mind, violence had erupted at the parade, and it began with the incident involving appellant. As for the statements of any other interview subjects, Mai stated that their comments were based upon their own perspectives, opinions, and observations. After getting updated information after the 6:00 p.m. broadcast, she reported in the 11:00 p.m. broadcast that criminal charges were expected to be filed, but there was no word at that point on exactly with what appellant would be charged.
 {¶ 16} After reviewing Mai's testimony, as well as the other evidence cited by appellant, we fail to find any question of law as to whether Sinclair's broadcast was made with actual malice. The record is wholly lacking in any evidence that Mai's statements were made with knowledge that they were false. With regard to Mai's statement that appellant would be charged with a felony — either aggravated assault or arson — despite appellant's contention that Mai knew the statements were false because she personally observed the events, Mai cannot be held to know the legal elements of particular crimes and second-guess police authorities as to why they may or may not bring certain charges under various circumstances. As the record reveals no evidence that Mai possessed the legal expertise to make her own legal judgments as to whether appellant's actions fulfilled the statutory requirements of felony counts of aggravated assault or arson, we find the record is devoid of any evidence to prove that she knew such statement was false.
 {¶ 17} As to reckless disregard, we also find appellant has failed to present evidence to raise any question of law on this issue. Appellant failed to present clear and convincing evidence that the false statements were made with a high degree of awareness of their probable falsity or that the defendant in fact entertained serious doubts as to the truth of her publication. Lacking legal expertise herself, Mai relied upon the public information officer for the police department to tell her what charges would be brought. She reported precisely what Sergeant Smith told her. Despite appellant's contention that Mai wished to "report now, get the facts later," Mai, in fact, had the facts at the time of her broadcast and related the charges that authorities informed her would be forthcoming. That authorities later changed their minds about the charges does not have any bearing on any reckless disregard by Mai in her initial broadcast. Mai's 6:00 p.m. broadcast included the potential charges, as she knew them to be at the time. Sergeant Smith was a "trusted source" and was specifically assigned to relate such information to news media in these types of situations. There existed no better source of what charges would be filed than the arresting authorities. Thus, we fail to find Sinclair acted with reckless disregard, as a matter of law, in publishing the statement regarding potential criminal charges.
 {¶ 18} Appellant also takes issue with Mai's statements that "violence erupted" and, later in the broadcast, that there had been "another fight," thereby implying appellant was involved in some initial "fight." However, we find appellant submitted no evidence to support that Mai made such statements with knowledge of their falsity or with reckless disregard for their truth or falsity. That "violence erupted" and there was a "fight" are two interpretations out of a number of possible rational interpretations of the events in question. SeeBose Corp., at 512. Mai testified that appellant was shouting and yelling very loudly; appellant was being very confrontational with parade goers and supporters; the police were hitting the arms of two young girls to get the flag from them; appellant was arguing with the police both during, before, and after he lit the flag; there was a commotion around appellant; and Mai was pushed and jostled throughout appellant's activities. Mai also stated that she considered the flag burning a violent act in itself, because it was completed while appellant argued with bystanders and police. The video evidence also showed an angry crowd screaming at appellant both during and after the time the flag was lit. As police walked appellant to the cruiser, appellant traversed a gauntlet of angry shouts, screams, and ridicule. The video also showed the police very forcefully taking the flag from the two teenage girls.
 {¶ 19} In addition, Siegel testified in her deposition that she saw a lot of verbal "conflict" and chaos at the scene, and, although she was uncertain if she would term it "violence," she understood why Mai used that word. She also stated when Mai stated that a second "fight" had broken out, she could understand how Mai may have viewed the first confrontation between appellant and police as a "fight," and that Mai's perspective would be one way of viewing the incident. Siegel also noted that Mai did not use the word "physical" to describe the first "fight." Siegel stated that she believed viewers could look at the Mai broadcast and view appellant's verbal altercation with police as the first "conflict."
 {¶ 20} Given the circumstances as viewed on the submitted tapes, and, based upon the testimony and averments presented, we find that Mai's use of the terms "violence" and "fight" were reasonable interpretations of the entire incident, both in the physical and the non-physical senses of the words. Mai made the statements in good faith, as the events she witnessed, described above, formed a reasonable basis upon which she could have justifiably relied in making the statements. See St.Amant, supra, at 732.
 {¶ 21} Appellant also claims that Mai's good faith should be doubted because TV6 decided to broadcast Fisher's comment about "them gassing or macing people," when Mai could not have believed this statement was true because she did not know about Critchet's accusation at that point that he had allegedly splashed gasoline on her legs, and Mai never witnessed anyone being maced. Mai countered that Fisher's comment was based upon her own observations and opinions as an eyewitness, and were not Mai's comments. Mai also stated that she thought the word "gassing" referred to the liquid used to light the flag.
 {¶ 22} Fisher's comments add little to the defamation analysis. We first note that a review of the broadcast reveals that Fisher stated "tear-gassing or macing people," not "gassing or macing people," as has been repeated throughout the pleadings. The record suggests that the police did dispense tear gas or mace on the ground to clear the area around the incident. Thus, the statement appears to have been true. Notwithstanding, the meaning of Fisher's comment is immaterial. Fisher was making a statement based upon her own perspective and opinion, and Mai was reporting what Fisher believed she witnessed. Under Ohio law, for a statement to be defamatory, it must be a statement of fact and not of opinion. Vail v. The Plain Dealer Publishing Co. (1995),72 Ohio St.3d 279; see, also, Section 11, Article I, of the Ohio Constitution. Whether an allegedly defamatory statement is an opinion or fact is a question of law for this court to decide. Yeager v. Local Union 20
(1983), 6 Ohio St.3d 369. Here, Fisher's statement itself could not have been defamatory, as it was merely Fisher's opinion of the incident. Further, Mai stated that she and her photographer followed appellant to the police cruiser, so she had no knowledge of whether these events related by Fisher might have transpired at the scene after she had left. As Mai witnessed a chaotic scene, she could have reasonably believed the events to which Fisher referred could have occurred, and she had no reason to doubt Fisher. Therefore, we find this contention does not aid appellant's defamation argument, and Sinclair did not act with reckless disregard, as a matter of law, in publishing the statements that "violence erupted" and there had been "another fight." For these reasons, we find that the trial court did not err in granting summary judgment to Sinclair. Appellant's first assignment of error is overruled.
 {¶ 23} Appellant argues in his second assignment of error that the trial court erred in granting summary judgment to Outlet. Specifically, appellant points out two instances of defamation with regard to Outlet. Appellant argues that Sinclair acted with actual malice when Siegel reported on TV4's 6:00 p.m. news broadcast that appellant "sprayed [Critchet] with gasoline during the flag burning," and that appellant would be charged with "either aggravated assault or aggravated arson." Appellant relies mainly upon Meyer's and Siegel's affidavits to support his arguments. However, after reviewing Meyer's and Siegel's averments, as well as the other evidence, we find no support for appellant's contentions.
 {¶ 24} With regard to the spraying of Critchet, appellant claims that no person who was present at the scene, including Siegel, could have believed that he sprayed gasoline on Critchet or anyone else, thereby proving Outlet acted with actual malice. Meyer, who poured the lamp oil on the flag, averred that the gasoline did not have a spraying mechanism, and he was certain that no lamp oil sprayed onto bystanders. He stated he carefully poured a small amount of lamp oil onto the flag and allowed it to dribble down the flag. Meyer indicated he had witnessed other such flag burnings and had learned that, when too much fluid is used, the flag burns too quickly, so he only used a small amount of lamp oil.
 {¶ 25} Siegel averred that, when she saw appellant at the parade, he was shouting and protesting the parade. She observed appellant engage in several arguments with both police and security regarding his right to burn a flag in public. After appellant shouted several minutes with police and security, Siegel observed fluid spraying into the crowd from appellant's direction. Siegel also stated she was lightly sprayed with the fluid, with the majority of the fluid spraying in Critchet's direction. Critchet started screaming, and the scene became very chaotic. Appellant then lit the flag. Siegel stated that Critchet was acting very concerned at this point, saying that she had been sprayed with gasoline. Bystanders doused Critchet's legs with water, and paramedics arrived. Siegel also saw police using their nightsticks to obtain the remnants of the burnt flag from two teenage girls. Siegel interviewed police officers at the scene, who indicated that appellant would be charged with either aggravated assault or aggravated arson. She also interviewed members of the Columbus Fire Department and the City Attorney's Office, who told her the crimes with which appellant would be charged.
 {¶ 26} Siegel testified similarly in her deposition. Siegel stated that appellant announced he was going to burn the flag and poured fluid on the flag. Siegel was standing three to four feet from appellant at the time, and the fluid from the gas can landed on her pants. She did not see the fluid hit anyone else. She also did not see appellant intentionally spraying the fluid. Siegel stated an officer told appellant he could not burn the flag. Shortly after the fluid was poured on the flag, Critchet started screaming that gasoline had gotten on her, and bystanders doused her legs with water. Critchet had been standing in front of appellant, in the direction of the spray of fluid. Fire department personnel or paramedics went to her aid. After the incident, Siegel spoke with police officers, who told her what had happened and what charges would be filed. It was Siegel's impression that one of the charges pertained to appellant having deliberately sprayed Critchet. Siegel stated that she was aware at the time that the United States Supreme Court had struck down some laws that had been passed in an attempt to prevent the burning of the American flag; however, she recalled no discussion with colleagues about whether appellant's First Amendment rights had been violated by his arrest. When she reported what potential charges would be brought against appellant, she was repeating what officers had told her and she stated that she would only question an officer if the charges seemed totally unrelated to anything she had witnessed, which these did not.
 {¶ 27} Although the discrepancy between Meyer's and Siegel's averments raises a genuine issue of fact as to whether appellant sprayed Critchet, such does not preclude summary judgment, as the pertinent issue is not whether Critchet was actually sprayed. Rather, what must be determined is whether Siegel acted with reckless disregard in stating that appellant had sprayed Critchet. After reviewing the testimony above and reviewing the other evidence cited by appellant, we fail to find any question of law as to whether Outlet's broadcast, in this regard, was made with actual malice. Appellant claims Siegel's averments are self-serving; however, Meyer's averments to the contrary are equally self-serving. Notwithstanding, even construing this evidence in favor of appellant, as we must do, there exists unrebutted evidence to support the conclusion that Siegel could have formed a reasonable belief that the lamp oil had sprayed on Critchet. The video evidence submitted to the court reveals that Critchet claimed the fluid had been splashed on her. The video also reveals several bystanders pouring bottled water over her legs. Siegel witnessed these events, and they were included in the broadcasts. Siegel also stated that she saw Critchet standing near appellant as the liquid was poured, and she saw Critchet screaming. Siegel also averred that paramedics arrived to aid Critchet. Thus, having personally witnessed the scene, Critchet's accusations, and the reactions of Critchet, bystanders, and paramedics, Siegel had a sound factual basis with which to report Critchet's allegations on her news broadcast. Whether Siegel herself was splashed with the fluid or whether Critchet was actually splashed with the fluid is immaterial. The surrounding circumstances show Siegel acted in good faith in making the statement, as Siegel could have justifiably relied upon everything she viewed and heard to form a foundation for such statement. See St.Amant, supra, at 732. Appellant has failed to offer any evidence to show that Siegel had a high degree of awareness of the probable falsity of this statement or that she entertained any doubt as to the truth of her publication.
 {¶ 28} With regard to Siegel's statement that appellant would be charged with "either aggravated assault or aggravated arson," for similar reasons as we cited with regard to appellant's claim against Sinclair, we fail to find any question of law as to whether Outlet's broadcast was made with actual malice. Appellant failed to present clear and convincing evidence that Siegel made the statement knowing it was false, made it with a high degree of awareness of probable falsity, or that she entertained serious doubts as to the truth of her publication. Like Mai, Siegel averred that appellant was arguing with police and telling them he was going to light the flag on fire despite their warnings, the scene was chaotic, and appellant lit the flag while still arguing with police. Siegel also testified that Critchet was screaming and doused with water because she said she had been splashed with the fluid. Further, like Mai, Siegel interviewed police officers, who indicated that appellant would be charged with either aggravated assault or aggravated arson. She also interviewed members of the Columbus Fire Department and the City Attorney's Office, who told her the crimes with which appellant would be charged. Siegel also personally witnessed the events that may have reasonably been seen by a layperson as fitting the elements of the charged crimes. There is no evidence Siegel was aware of the statutory elements necessary to prove these crimes, and she cannot be faulted by the decision of the charging authorities to change their minds as to with what crimes appellant should have been charged. Further, the events Siegel viewed demonstrate she acted in good faith, as there was some basis in fact for her statement, and there was information upon which she could have justifiably relied in making the statement regarding the charges. See St. Amant, at 732. This is not a situation where Siegel wholly fabricated the charges or based them on an unverified anonymous informant. See id. For these reasons, we find Outlet was entitled to judgment as a matter of law. Therefore, appellant's second assignment of error is overruled.
 {¶ 29} Appellant argues in his third assignment of error that the trial court erred in granting the Civ. R. 12(B)(6) motion to dismiss filed by the City. When reviewing a judgment on a Civ. R. 12(B)(6) motion to dismiss for failure to state a claim upon which relief can be granted, an appellate court's standard of review is de novo.Perrysburg Twp. v. Rossford, 103 Ohio St.3d 79, 2004-Ohio-4362, at ¶ 5. A motion to dismiss for failure to state a claim upon which relief can be granted is procedural and tests the sufficiency of the complaint.State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs. (1992),65 Ohio St.3d 545, 548. In considering a Civ. R. 12(B)(6) motion to dismiss, a trial court cannot rely upon materials or evidence outside of the complaint. State ex rel. Fuqua v. Alexander (1997), 79 Ohio St.3d 206,207. The trial court must review only the complaint and may dismiss the case only if it appears "beyond [a] doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery."O'Brien v. University Community Tenants Union (1975), 42 Ohio St.2d 242, syllabus. Moreover, a court must presume that all factual allegations in the complaint are true and all reasonable inferences must be drawn in favor of the non-moving party. Mitchell v. Lawson Milk Co. (1988),40 Ohio St.3d 190, 192; Ritchie v. Ohio Adult Parole Auth., Franklin App. No. 05AP-1019, 2006-Ohio-1210, at ¶ 16. However, "unsupported conclusions of a complaint are not considered admitted and are not sufficient to withstand a motion to dismiss." State ex rel. Seikbert v.Wilkinson (1994), 69 Ohio St.3d 489, 490.
 {¶ 30} Appellant alleged in his complaint against Jackson and Varner that Varner made a statement to the media in August 2001, that the City Attorney's Office had waited to file the charges against appellant until it could "verify" Critchet's allegations with "other witnesses." Specifically, appellant alleged in his complaint:
 23. Varner's defamatory innuendo/statements were published after the City filed Assault and Aggravated Menacing charges against Spingola in August 2001. In spite of the fact that the City Defendants had found no witness to corroborate Critchet's false, defamatory and outlandish gasoline allegations, Varner stated to the media in August 2001 that the City and Jackson had waited to file the charges because the City had to "verify" Critchet's account with "other witnesses[."] Not only was Varner's statement implying that other witnesses had verified Critchet's allegations itself a falsehood, but the City Defendants actually had evidence at that time that cast serious doubt on Critchet's story. Varner's unfounded statements therefore only added to defamatory attacks on Spingola's reputation previously published by the other Defendants, at a time when the City Defendants had a duty to be seeking truth and justice.
 24. The City produced no witness during Spingola's criminal trial to corroborate Critchet's allegations, and a jury acquitted Spingola of both charges after only 20 minutes of deliberation.
 {¶ 31} We first note that appellant conceded below that the city of Columbus is not liable under state law for Varner's statements, due to its immunity from liability under R.C. 2744.02. As for Jackson, the only theory appellant claimed against her was that she was liable because Varner made the statements on her behalf as her spokesperson; thus, any liability on behalf of Jackson would be solely based upon whether Varner's statement was defamatory. Accordingly, we must examine Varner's statement to determine if Jackson and Varner are liable. With regard to Varner's statement, the trial court concluded that appellant did not sufficiently plead a cause of action for defamation. The trial court found that, because the imputation or "gist" of the statement was that appellant had been charged with assault and aggravated menacing and not that other witnesses had verified Critchet's allegations, the entire statement was substantially true, so as to preclude a defamation action.
 {¶ 32} Although in dismissing appellant's complaint with regard to the City, the trial court relied upon the insufficiency of the complaint to demonstrate the falsity element of defamation, we find that appellant's complaint failed to plead sufficient facts to demonstrate the actual malice element. With regard to actual malice, appellant pled in his complaint that the City "actually had evidence at that time that cast serious doubt on Critchet's story." The only factual allegation appellant relies upon in his complaint to support such a conclusion is that the city of Columbus "produced no witness during Spingola's criminal trial to corroborate Critchet's allegations, and a jury acquitted Spingola of both charges after only 20 minutes of deliberation." In his appellate brief, appellant reiterates that the only proof that he has to demonstrate that there were no "other witnesses" in existence, and Varner knew this when he made the statement, is the lack of any witnesses produced at trial by the city of Columbus. However, even if we were to construe this factual allegation in favor of appellant and consider it true, appellant would still be unable to demonstrate that Varner's statement was made with actual malice. Initially, merely because the city of Columbus produced no witnesses to support Critchet's allegation at appellant's trial does not demonstrate that Varner knew that it could not "verify" Critchet's account with other witnesses. There may be other reasons why no witnesses testified to Critchet's account at trial.
 {¶ 33} In addition, Varner's statement that the City Attorney's Office had waited to file the charges until it could verify Critchet's account had other rational interpretations that were not defamatory. SeeBose Corp., at 512. The statement could have been reasonably interpreted to mean that the City Attorney's Office had located witnesses that could verify various elements of the crimes but not necessarily every element of the crimes. The City Attorney's Office could have planned to rely upon Critchet's own testimony to prove certain elements of the offenses. Also, the statement could have been reasonably interpreted to mean that the City Attorney's Office had spoken with witnesses who had been present at the scene, who had heard Critchet's allegations contemporaneously with the time it allegedly happened, and who had seen some corroborating evidence that she had been splashed with the flammable liquid. Despite appellant's claims to the contrary, Varner's statement did not indicate that it had found eyewitnesses to the actual dousing of Critchet. Therefore, we find appellant's complaint failed to allege operative facts that, even if believed, would have subjected Varner to liability for defamation. Because we cannot find Varner's statement defamatory, Jackson also cannot be liable. Although the City presents several other arguments in favor of dismissal, because Varner's statement was not defamatory, we need not address any additional grounds for dismissal. Therefore, appellant's third assignment of error is overruled.
 {¶ 34} Accordingly, appellant's three assignments of error are overruled, and the judgments of the Franklin County Court of Common Pleas are affirmed.
Judgments affirmed.
KLATT, P.J., and FRENCH, J., concur.