[Cite as *Waters v. Ohio State Univ.*, 2016-Ohio-5260.]

| JONATHAN N. WATERS | Case No. 2015-00457 |
|---|---|
| Plaintiff | Judge Patrick M. McGrath |
| v. | DECISION |
| THE OHIO STATE UNIVERSITY | |
| Defendant | |

{¶1} Before the court for determination is a Civ.R. 12(C) motion for judgment on the pleadings filed by defendant The Ohio State University (OSU), which plaintiff Jonathan N. Waters opposes. Because the court concludes that OSU is entitled to judgment as a matter of law, the court grants OSU's motion.

## I. Background

{¶2} On February 1, 2013, Waters became the "full-time" director of the OSU marching band and athletic bands. (Complaint at ¶ 1; Answer at ¶ 1.) According to OSU, prior to Waters' appointment as band director, he served as an OSU band member, a graduate assistant with the band, assistant director of the band, and interim director of the band. (Answer at ¶ 1.) As director of the band, Waters traveled throughout Ohio and elsewhere to raise funds on behalf of OSU. (Complaint at ¶ 1; Answer at ¶ 1.) While Waters served as the band's director, the OSU marching band received national and international attention for its performances. (Complaint at ¶ 1; Answer at ¶ 1.)

{¶3} Waters claims that on May 1, 2014 the United States Department of Education, Office of Civil Rights, named OSU as one of 55 colleges and universities under investigation for possible violations of federal law related to the handling of sexual violence and harassment complaints. (Complaint at ¶ 3.) OSU denies this claim;

rather, according to OSU, it and the United States Department of Education, Office for Civil Rights, began a compliance review of OSU's Title IX program on June 23, 2010, and the United States Department of Education, Office for Civil Rights presented a draft Resolution Agreement to OSU in August 2013.  (Answer at ¶ 3.)

{¶4} On May 23, 2014, a parent of an OSU marching band member reported information about the band's culture to OSU's Office of University Compliance and Integrity because the parent was concerned that the band's culture was sexualized and that its members were made to swear secrecy oaths about objectionable traditions and customs.  (Complaint at ¶ 3; Answer at ¶ 3, Exhibit C.)  The parent requested an investigation of the allegations.  (Answer, Exhibit C.)  According to OSU, the information constituted a complaint under university policy and Title IX of the Education Amendments of 1972.[1]  (Answer, Exhibit C.)  The Office of University Compliance, which oversees Title IX compliance for OSU, investigated the issues raised by the parent's complaint, "as required by university policy and federal law."  (Exhibit C to Answer at 1.)[2]

---

[1]OSU represents that the information provided by the band member's parent in May 2014 was not the first allegation involving Waters and the OSU bands.  (Answer at ¶ 3.)  Exhibit C to OSU's Answer indicates that an allegation involving Waters' treatment of a specific student in 2013 was investigated by OSU's Office of University Compliance and Integrity and this claim could not be substantiated.  (Exhibit C to OSU Answer at 3, footnote 2.)  Also, according to Exhibit C, "in the Fall of 2013, a Marching Band member sexually assaulted a fellow Band member, leading to the former student's expulsion following an investigation and adjudication by Student Conduct at that time. Second, an incident of sexual harassment by an Athletic Band member of a fellow Athletic Band member occurred in March 2013. Significant concerns were raised at the time about the manner in which Waters responded to the March 2013 incident." (Exhibit C to OSU's Answer at 12, footnote 7.)

[2]Exhibit C to OSU's Answer at 21 states, "University policy places a 'duty to act' on the university administration.  Similarly, the Office for Civil Rights states that a university has a responsibility to take 'prompt and effective steps to respond to sexual harassment' and that 'if a school determines that sexual harassment that creates a hostile environment has occurred, it must take immediate action to eliminate the hostile environment, prevent its recurrence, and address its effects.'"

Notably, in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), the United States Supreme Court considered whether a school district may be held liable in damages in an implied right of action under Title IX of the Education Amendments of 1972 for the sexual harassment of a student by one of the district's teachers.  *Gebser* concluded that "damages may not be recovered in those circumstances unless an official of the school district who at a minimum has authority

{¶5} On July 22, 2014, OSU issued a report based on its investigation (Title IX Investigation Report). (Exhibit C to Answer.) This report found that the marching band's culture "facilitated acts of sexual harassment, creating a hostile environment for students" and that "Jonathan Waters knew or reasonably should have known about this culture but failed to eliminate the sexual harassment, prevent its recurrence, and address its effects." (Exhibit C to Answer, at 21.) Among suggested corrective action, the Title IX Investigation Report recommended, "Take appropriate personnel action to address all concerns." (Id. at 22.) On July 24, 2014—two days after the Title IX Investigation Report was issued—OSU dismissed Waters as director of its marching band and athletic bands. (Complaint at ¶ 12; Answer at ¶ 12.)

{¶6} Several months later—in September 2014—Waters sued OSU and other defendants in the United States District Court for the Southern District of Ohio, alleging violations of due process, and disparate treatment and retaliation in violation of Title IX and its implementing regulations. (Exhibit A to Answer.)

{¶7} On May 8, 2015, Waters sued OSU in this court, asserting three causes of action: (1) defamation, (2) slander per se, and (3) false-light invasion of privacy.

---

to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." *Id.* at 277. In *Gebser*, the Court explained, "Title IX provides in pertinent part that, 'no person * * * shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.' 20 U.S.C. § 1681(a). The express statutory means of enforcement is administrative: The statute directs federal agencies who distribute education funding to establish requirements to effectuate the nondiscrimination mandate, and permits the agencies to enforce those requirements through 'any * * * means authorized by law,' including ultimately the termination of federal funding. § 1682." *Gebser* at 280-281.

Later in *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 119 S.Ct. 1661, 143 L.E.2d 839 (1999), the United States Supreme Court considered "whether the misconduct identified in *Gebser* -- deliberate indifference to known acts of harassment -- amounts to an intentional violation of Title IX, capable of supporting a private damages action, when the harasser is a student rather than a teacher." *Davis* at 643. *Davis* "conclude[d] that, in certain limited circumstances, it does." *Id.* In *Davis*, the Court noted that it had recognized an implied private right of action under Title IX and that it had held that money damages are available in such suits. *Id.* at 640. *Davis* states, "Having previously determined that 'sexual harassment' is 'discrimination' in the school context under Title IX, we are constrained to conclude that student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute." *Id.* at 650.

According to Waters, these causes of action stem from OSU's Title IX Investigation Report, certain press releases issued by Chris Davey, Assistant Vice President, Media and Public Relations, after OSU's dismissal of Waters, and comments by Michael V. Drake, M.D., President of OSU, following the dismissal of Waters. OSU has answered Waters' complaint, admitting some allegations but denying that it is liable for defamation, slander per se, and false-light invasion of privacy.

{¶8} After Waters filed his complaint, the parties engaged in motion practice before the court, filing various motions and briefings between 2015 and 2016. With the exception of this motion for judgment on the pleadings filed by OSU pursuant to Civ.R. 12(C), the court has ruled upon the other motions filed by the parties. On February 24, 2016, on Waters' counsel's motion, the court permitted Waters' counsel to withdraw in this case. Waters subsequently has filed a notice of proceeding pro se.

## II. OSU's Motion for Judgment on the Pleadings and Waters' Response

{¶9} In its motion for judgment on the pleadings, OSU asserts that Waters' claims should fail because he has acknowledged in his complaint that OSU's conclusions about the band, as set forth in the Title IX Investigation Report, are true. OSU essentially urges: (1) that Waters improperly attempts to convert the findings of OSU's investigation about the band's culture into findings about him and, as a consequence, Waters lacks standing; (2) that Waters has admitted to the truth of the conclusions of OSU's investigation and he cannot demonstrate a false statement to support his claims and, as a consequence, President Drake's and Chris Davey's subsequent statements are true and non-defamatory; (3) that Waters cannot overcome enhanced burdens—i.e., he cannot prove that OSU acted with actual malice insofar as Waters is a public figure—"most likely a general purpose public figure, but at least a limited purpose public figure" (Motion for Judgment on the Pleadings at 34)—and required to plead and prove actual malice; (4) that Waters may not overcome immunities that apply to his claims,

e.g., a public policy privilege and discretionary immunity, and (5) that Waters' demand for punitive damages should be dismissed.

{¶10} In opposition, Waters contends that OSU's motion for judgment on the pleadings is a disguised motion for summary judgment and he maintains that the Ohio Rules of Civil Procedure require notice pleading and his pleading conforms to this standard. He notes that OSU in its motion does not address alleged defamatory comments by President Michael V. Drake, M.D., and Assistant Vice President, Media and Public Relations, Chris Davey.

{¶11} Waters urges that standing exists because OSU's Title IX Investigation Report holds him accountable for the culture that existed during his last 12 years with the band. He asserts that OSU is asking the court to apply qualified privileges that may not be properly considered without a factual record and that OSU's claims of a conditional public policy privilege or discretionary immunity to publish false statements are premature. Waters maintains that judgment on the pleadings in favor of OSU based on qualified immunity should fail because factual questions exist whether OSU acted in good faith concerning the purpose and scope of the publication of its Title IX Investigation Report. Waters further maintains that, although discretionary immunity may protect a discretionary decision, discretionary immunity does not protect wrongful conduct in the implementation of a discretionary decision. Waters contends that OSU should not be permitted to raise the issue of discretionary immunity because it did not raise it as an affirmative defense in its answer. Waters asserts that his status is one of a private individual and whether he is a public figure for any purpose cannot be resolved at the pleading stage because a determination of this issue involves numerous questions of fact. Waters concedes, however, that he may not seek punitive damages against OSU.

### III. Analysis

{¶12} Civ.R. 12(C) permits motions for judgment on the pleadings, providing: "After the pleadings are closed but within such times as not to delay the trial, any party may move for judgment on the pleadings." In *S.E.A. Inc. v. Dunning-Lathrop & Assocs.*, 10th Dist. Franklin Nos. 03AP-1051, 03AP-1052, 2004 Ohio App. LEXIS 3734, at *11-12 (Aug. 5, 2004), the Tenth District Court of Appeals stated, "The Ohio Supreme Court has made it abundantly clear that a court's review of a Civ.R. 12(C) motion is limited exclusively to the allegations contained in the complaint and answer, and any writings properly attached to such and that a trial court may not consider any other evidentiary materials." Thus, applying *S.E.A. Inc.* to this case, when determining OSU's Civ.R. 12(C) motion for judgment on the pleadings, this court is limited to the allegations contained in the complaint and answer and any writing that is properly attached to them.

{¶13} In *State ex rel. Midwest Pride IV, Inc. v. Pontious*, 75 Ohio St.3d 565, 570, 664 N.E.2d 931 (1996), the Supreme Court of Ohio discussed the standard for determining a Civ.R. 12(C) motion for judgment on the pleadings, stating: "Civ.R. 12(C) motions are specifically for resolving questions of law, *Peterson v. Teodosio* (1973), 34 Ohio St.2d 161, 166, 63 Ohio Op. 2d 262, 264, 297 N.E.2d 113, 117." *Pontious* states at 570: "Under Civ. R. 12(C), dismissal is appropriate where a court (1) construes the material allegations in the complaint, with all reasonable inferences to be drawn therefrom, in favor of the nonmoving party as true, and (2) finds beyond doubt, that the plaintiff could prove no set of facts in support of his claim that would entitle him to relief."

{¶14} Thus, applying *Pontious*, at issue is whether, after construing the material allegations in Waters' complaint, with all reasonable inferences drawn in his favor as true, whether OSU is entitled to judgment as a matter of law.

{¶15} Waters sets forth three causes of action—defamation, slander per se, and false-light invasion of privacy. These causes of action essentially present claims of defamation—as slander per se is a form of defamation—and invasion of privacy based

on having been placed before the public in a false light. *See Sweitzer v. Outlet Communications, Inc.*, 133 Ohio App.3d 102, 108, 726 N.E.2d 1084 (10th Dist.1999) ("There are two forms of defamation: libel or slander. Generally, slander refers to spoken defamatory words and libel refers to written defamatory words"); *Welling v. Weinfeld*, 113 Ohio St.3d 464, 2007-Ohio-2451, 866 N.E.2d 1051, ¶ 61 (recognizing the tort of false-light invasion of privacy).

### A. *Standing*

{¶16} OSU challenges whether Waters has standing to bring this action because, in its view, Waters mainly disputes issues in a report that concerns the OSU marching band—not him. "'It is well established that before an Ohio court can consider the merits of a legal claim, the person seeking relief must establish standing to sue.'" *Clifton v. Blanchester*, 131 Ohio St.3d 287, 2012-Ohio-780, 964 N.E.2d 414, ¶ 15, quoting *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451, 469, 715 N.E.2d 1062 (1999). In *Clifton* at ¶ 15, the Ohio Supreme Court explained:

> "'"[T]he question of standing depends upon whether the party has alleged such a 'personal stake in the outcome of the controversy * * *' as to ensure that 'the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.'"'" Id., quoting *State ex rel. Dallman v. Franklin Cty. Court of Common Pleas* (1973), 35 Ohio St.2d 176, 178-179, 64 O.O.2d 103, 298 N.E.2d 515, quoting *Sierra Club v. Morton* (1972), 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636, quoting *Baker v. Carr* (1962), 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663, and *Flast v. Cohen* (1968), 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947.

The Executive Summary of OSU's Title IX Investigation Report—a report that is appended to OSU's answer—states: "Jonathan Waters, the Marching Band's Director, knew or reasonably should have known about [the] culture [that facilitated acts of sexual harassment, creating a hostile environment for students] but failed to eliminate the sexual harassment, prevent its recurrence, and address its effects." Thus, according to

the Executive Summary, the report does not just concern findings related to the OSU marching band, as OSU contends.  OSU's argument that Waters lacks standing in this cause because the Title IX Investigation Report concerns the band—not him—is unpersuasive.

**B.** ***Suggestion that Waters Has Admitted to the Truth of the Findings of the Title IX Investigation Report***

{¶17} OSU maintains that it should be granted judgment on the pleadings because, according to OSU, Waters has admitted to the truth of the conclusions of OSU's investigation and he cannot demonstrate a false statement to support his claims. According to OSU, Waters "concedes the substantial truth of the Title IX investigation report.  He alleges in conclusory fashion that the Title IX Investigation Report is defamatory because, '[t]he Glaros Report [sic] and subsequent statements by OSU trustees, officers, and employees, alleged that Waters failed to take action to address issues of harassment in the OSU Band, prevent its recurrence, and address its effects,' and that '[t]hose statements and others detailed in this Complaint are false.' ¶ 92. * * *." (Motion for Judgment on the Pleadings at 20-21.)

{¶18} A review of Waters' complaint discloses that, according to Waters, issues related to OSU band culture existed before he became director of the band.  In his complaint at paragraph 26, Waters states: "Activities which were demeaning and created a hierarchy among students had existed for many decades. Some were continuing when Waters assumed Band leadership.  Upon becoming Band Director, Waters immediately began to reshape the culture to address these lingering issues." And in "An Analysis & Review of Cultural Change in The Ohio State University Marching & Athletic Band Program"—exhibit B appended to OSU's answer—the document states at page 1: "During the past 20 months, upon being named director of The OSU Marching and Athletic Bands and inheriting a band culture in dire need of change, I began a process with our band staff of concentrated pressure for real, lasting change

within the organization." At the last page of exhibit B, the document states, "In summation, the items outlined above represent the acumen of action taken to change a negative culture that was built over many decades. The staff and students are acutely aware of the need for change and continue together to endeavor to create a better, more inclusive, safe, and open environment in The Ohio State University Marching and Athletic Bands."

{¶19} Although Waters admits that problems existed within the band's culture when he became band director, it does not necessarily follow that these admissions are tantamount to an admission of the conclusions contained in OSU's Title IX Investigation Report. Upon review, the court finds that OSU's argument that Waters has admitted to the truth of the findings of the Title IX Investigation Report is not persuasive.

## C. *Discretionary Immunity*

{¶20} OSU maintains that the doctrine of discretionary immunity applies because it was required by federal law to investigate the OSU's band culture following the complaint by a band member's parent and to take remedial action. Waters contends that OSU should not be permitted to raise the issue of discretionary immunity because it did not raise it as an affirmative defense in its answer.

{¶21} Generally, the defense of discretionary immunity is an affirmative defense within the contemplation of Civ.R. 8(C). *Pottenger v. Ohio Dep't of Transp.*, 10th Dist. Franklin No. 88AP-832, 1989 Ohio App. LEXIS 4549, at *6 (Dec. 7, 1989). In its answer, as a sixteenth defense, OSU asserts that "some or all of plaintiff's claims are barred by the doctrine of governmental immunity." (Answer at ¶ 128.) The court finds that this sixteenth defense is sufficient to raise the doctrine of discretionary immunity as a defense.

{¶22} In *Reynolds v. State, Div. of Parole & Community Servs.*, 14 Ohio St.3d 68, 471 N.E.2d 776 (1984), paragraph one of the syllabus, discussing the doctrine of discretionary immunity, the Ohio Supreme Court held:

The language in R.C. 2743.02 that "the state" shall "have its liability determined * * * in accordance with the same rules of law applicable to suits between private parties * * *" means that the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion. However, once the decision has been made to engage in a certain activity or function, the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities.

{¶23} The doctrine of discretionary immunity has been applied in various contexts. *See, e.g., Risner v. Ohio Dept. of Transp.*, 145 Ohio St.3d 55, 2015-Ohio-4443, 46 N.E.3d 687 (applying discretionary immunity to the Ohio Department of Transportation (ODOT)). In *Risner*, 145 Ohio St.3d 55, 2015-Ohio-4443, 46 N.E.3d 687, the Ohio Supreme Court used the term "discretionary-function doctrine" as "shorthand to mean that the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision that is characterized by the exercise of a high degree of official judgment or discretion." (Footnote omitted.) *Risner* at ¶ 12. In *Risner*, the Supreme Court of Ohio recognized that "ODOT's expertise in highway design and construction and its understanding of the vast network of highways throughout the state, together with the fact that it is statutorily authorized to improve the state's highways, make it the foremost authority on the subject of highway improvements. The current framework of Ohio law prevents the judicial branch from second-guessing ODOT's decisions in this regard." *Risner* at ¶ 18. *Risner* determined that decisions of ODOT to improve a particular portion of an intersection, to not improve other portions of the intersection, and its decision regarding what type of improvement to make to the intersection were protected by the discretionary-function doctrine. *Id.* at ¶ 17-18. However, *Risner* cautions that "while ODOT is immune from any liability arising from the decisions made pursuant to

its discretionary function, immunity does not extend beyond that discretionary function to acts of implementation." *Id.* at ¶ 24.

{¶24} Applying the reasoning of *Risner*, because OSU has authority related to self-government, *see* R.C. 3335.02 (government of OSU is vested in its board of trustees), it follows that, in accordance with this authority, OSU may set forth policies related to the university. Just as in *Risner*—in which ODOT enjoyed discretionary immunity with respect to what improvements it determined that should be made to an intersection—the court finds that, with respect to the Title IX Investigation Report, OSU's decisions regarding what to include in or exclude from its Title IX Investigation Report and the conclusions contained in the report fall within the scope of the discretionary-function doctrine. In the court's view, the Title IX Investigation Report is an exercise of official judgment by OSU based on its understanding of applicable law and university policy, as well as its understanding of its duties and obligations imposed by law and university policy. The court further finds that the contents of press releases, as alleged in the complaint, and Dr. Drake's comments, as alleged in the complaint and as set forth in a transcript of proceedings transcribed from an audio recording (Exhibit B to Waters' complaint), fall within the ambit of the discretionary-function doctrine as they serve to explain the Title IX Investigation Report and OSU's decision to dismiss Waters as director of its marching and athletic bands.

{¶25} However, notwithstanding that the discretionary-function doctrine applies, the discretionary-function doctrine (i.e., discretionary immunity) does not of itself protect OSU from potential wrongful conduct in the implementation of its discretionary decisions. *See Risner* at ¶ 24. OSU's contention that application of discretionary immunity necessarily should result in a judgment in its favor as to its motion for judgment on the pleadings is not well-taken.

## D. *Defamation*

{¶26} "To establish defamation, a plaintiff must show: (1) the defendant made a false statement, (2) the statement was defamatory, (3) the statement was published, (4) the plaintiff was injured as a result of the statement, and (5) the defendant acted with the required degree of fault." *Cooke v. United Dairy Farmers, Inc.*, 10th Dist. Franklin No. 02AP-781, 2003-Ohio-3118, ¶ 24. "[A]s a matter of description, most defamation cases involve publications imputing to the plaintiff (1) a serious crime involving moral turpitude or a felony; or (2) a character trait that makes her unfit for, or conduct incompatible with, her business, trade, or profession; (3) acts or views opposing some deeply held moral standard of the community, even when no crime has been asserted; (4) physical or other traits that show no violation at all of community standards but would nevertheless induce others to shun the plaintiff or avoid dealing with her." 2 Dan B. Dobbs, *The Law of Torts*, Section 403, 1128 (2001).

{¶27} "'[I]t is for the court to decide as a matter of law whether certain statements alleged to be defamatory are actionable or not.'" *Am. Chem. Soc. v. Leadscope, Inc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, ¶ 78, quoting *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 6 Ohio St.3d 369, 372, 453 N.E.2d 666 (1983). The Ohio Supreme Court explained in *Leadscope* at ¶ 79:

> "In determining whether a statement is defamatory as a matter of law, a court must review * * * the totality of the circumstances" and by "read[ing] the statement[] * * * in the context of the entire [publication] to determine whether a [reasonable] reader would interpret [it] as defamatory." *Mann v. Cincinnati Enquirer*, 1st Dist. No. C-09074, 2010-Ohio-3963, ¶ 12, citing *Scott v. News-Herald*, 25 Ohio St.3d 243, 253, 496 N.E.2d 699 (1986), and *Mendise v. Plain Dealer Publishing Co.*, 69 Ohio App.3d 721, 726, 591 N.E.2d 789 (1990).
>
>> [T]he words of the publication should not be considered in isolation, but rather within the context of the entire [publication] and the thoughts that the [publication] through

> its structural implications and connotations is calculated to convey to the reader to whom it is addressed.

*Connaughton v. Harte Hanks Communications, Inc.,* 842 F.2d 825, 840 (6th Cir.1988), *aff'd*, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

Thus, in accordance with *Leadscope* it is proper for the court to determine whether the statements identified by Waters constitute defamation as a matter of law by considering the totality of the circumstances and reading the alleged defamatory statements in the context of the entire publication.

### *Qualified Privilege*

{¶28} After a plaintiff's prima facie case for defamation is established, a defendant may invoke a defense of a qualified privilege, if available. *Hahn v. Kotten*, 43 Ohio St.2d 237, 243, 331 N.E.2d 713 (1975). "Where the content of the alleged defamatory communication and/or the circumstances under which the communication is published are not in dispute, the determination of whether a qualified privilege exists is a question of law to be determined by the court." *Costanzo v. Timmerman*, 10th Dist. Franklin No. 96APE04-486, 1996 Ohio App. LEXIS 4786, at *8 (Oct. 29, 1996), citing *McCartney v. Oblates of St. Francis deSales*, 80 Ohio App.3d 345, 355, 609 N.E.2d 216 (6th Dist.1992). Here, the alleged defamatory communications and the circumstances under which the communications were published are not in dispute. Thus, whether a qualified privilege exists in this matter constitutes a question of law for this court to determine.

{¶29} In *Costanzo*, the Tenth District Court of Appeals discussed the concept of a qualified privilege, stating:

> "'A qualified or conditionally privileged communication is one made in good faith on any subject to which the person communicating has an interest, or in reference to which he has a right or duty, if made to a

person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right or interest. *The essential elements thereof are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only.*'" (Emphasis added.) [*Hahn v. Kotten* (1975),] 43 Ohio St. 2d [237] at 243-244 * * *."

*Costanzo*, 10th Dist. Franklin No. 96APE04-486, 1996 Ohio App. LEXIS 4786, at *8-9 (Oct. 29, 1996), quoting *Burkes v. Stidham*, 107 Ohio App. 3d 363, 373, 668 N.E.2d 982 (8th Dist.1995). In *Hahn*, 43 Ohio St.2d at 243-244, 331 N.E.2d 713 (1975), when discussing the concept of qualified privilege, the Ohio Supreme Court noted, "As Prosser states in his Law of Torts (4 Ed.) 786, Section 115: '* * * It is difficult to reduce the cases to any single statement, and perhaps no better formula can be offered than that of Baron Parke that the publication is privileged when it is "fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned."'"

{¶30} The court finds that OSU's issuance of the Title IX Investigation Report was made in the discharge of a duty to investigate purported sexual harassment in the OSU marching band. As noted by the federal district court in Waters' related federal action, OSU's Title IX Investigation Report "did not come in the form of a baseless tabloid. The Plaintiff may contend that Defendants overreacted, that they were ill-advised in assigning blame to him for alleged practices for which he could not have been fully responsible. But this is a question of degree, a balancing of considerations by University decisionmakers exercising their discretion, in the face of a Title IX investigation, on how to treat an at-will employee." *Waters v. Drake*, 105. F.Supp.3d 780, 803 (S.D.Ohio 2015). Here, OSU had an obligation to investigate the allegations of the parent of a band member and it was obliged to give a publication of the compelled investigation with a report detailing the investigation's findings and conclusions. As the publication concerned OSU's dismissal of its marching band

director, it was a subject of public concern.  *See Woods v. Capital Univ.*, 10th Dist. Franklin No. 09AP-166, 2009-Ohio-5672, ¶ 38 ("'[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication.' *San Diego v. Roe* (2004), 543 U.S. 77, 83-84, 125 S.Ct. 521, 525-26, 160 L. Ed. 2d 410").  The press releases cited by Waters in his complaint and Dr. Drake's comments cited by Waters in his complaint serve to explain the Title IX Investigation Report and OSU's decision to terminate Waters' employment—subjects of public concern—and thus these publications were for a proper purpose.  It is beyond cavil that a public university may issue press releases relating to matters of public concern, such as the dismissal of a prominent employee or official. *See, e.g., Haywood v. Univ. of Pittsburgh*, 976 F.Supp.2d 606, 623 (W.D.Pa.2013) (press release announcing termination of a university head football coach's employment).  It is also beyond doubt that administrative officials of a public university may make public comments associated with the issuance of such press releases.  The court finds that a qualified privilege applies to the Title IX Investigation Report, the press releases cited by Waters, and Dr. Drake's comments as cited by Waters.

{¶31} The parties dispute whether Waters should be considered a private or public figure in the context of this case, with Waters contending that he is a private person and that a determination of this issue involves numerous questions of fact.  OSU maintains that Waters should be considered a public person because, as director of the OSU marching band, he "enjoyed 'national – and even international acclaim.'"  (Motion for Judgment on the Pleadings at 31.).  Whether Waters should be considered a private person or a public figure, or limited-purpose public figure has significance because it concerns Waters' burden of proof with regard to his defamation claims.  *See Brown v. Lawson*, 169 Ohio App.3d 430, 2006-Ohio-5897, 863 N.E.2d 215 (1st Dist.), ¶ 10; *Talley v. WHIO TV-7*, 131 Ohio App.3d 164, 169, 772 N.E.2d 103 (2d Dist.1998).

{¶32} "The determination of whether a party is a private or public figure is a matter of law." *Curry v. Vill. of Blanchester*, 12th Dist. Clinton Nos. CA2009-08-010, CA2009-08-012, 2010-Ohio-3368, ¶ 42; *Kassouf v. Cleveland Magazine City Magazines*, 142 Ohio App.3d 413, 421, 755 N.E.2d 976 (11th Dist.2001). *See Huntington Trust Co., N.A. v. Chubet*, 10th Dist. Franklin No. 97APF12-1591, 1998 Ohio App. LEXIS 5420, at *21 (Nov. 10, 1998) ("Whether a party is a public figure is a question of law for the court"); *Gilbert v. WNIR 100 FM*, 142 Ohio App.3d 725, 735, 756 N.E.2d 1263 (9th Dist.2001) ("whether one is a public figure is necessarily a question of law for the trial judge to determine"). In *Woods v. Capital University*, 10th Dist. Franklin No. 09AP-166, 2009-Ohio-5672, at ¶ 36, the Tenth District Court of Appeals discussed the continuum between a public figure, a limited-purpose public figure, and a private figure, stating:

> At one extreme of this continuum sits the public figure, who has achieved "general fame or notoriety in the community" and "pervasive involvement in the affairs of society." [*Gertz v. Robert Welch*], 418 U.S. at 352, 94 S.Ct. at 3013. Located at the middle point of the continuum, the limited-purpose public figure is an individual who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz*, 418 U.S. at 351, 94 S.Ct. at 3013. Courts generally examine two factors to determine whether a person is a limited-purpose public figure: (1) the person's participation in the controversy from which the alleged defamation arose, and (2) whether that person has attained a general notoriety in the community as a result of that participation. *Cooke v. United Dairy Farmers, Inc.*, 10th Dist. No. 04AP-817, 2005-Ohio-1539, ¶ 32; *Featherstone v. CM Media, Inc.*, 10th Dist. No. 02AP-65, 2002-Ohio-6747, ¶ 27. If a person is neither a public figure nor a limited-purpose public figure, then he falls into the private-figure end of the continuum.

{¶33} In paragraph one of his complaint, Waters asserts:

> Jonathan Waters ("Waters") became the full-time Director of The Ohio State Marching and Athletics Bands (the "OSU Band" or the "Band")

on February 1, 2013.  The following year, Waters led the OSU Band to its most successful season ever, receiving national - and even international - acclaim. *The Wall Street Journal* in a November 1, 2013 article entitled *"Why Ohio State's Band is Truly the Best in the Land"* wrote that "[h]ere in Ohio State country, it's hard to say who is having a better season - the school's undefeated football team or its marching band." Laudatory headlines peppered news outlets worldwide - from Britain's *Daily Mail* to Australia's *Sydney Morning Herald.* The NBC *Today* show broadcast nationally a live performance of the OSU Band, and the OSU Band's performances were YouTube sensations, with millions of viewers watching their performances each week.  And indicative of just how much its popularity had grown, the OSU Band was featured in Apple's "*Your Verse"* commercial for the iPad Air starting in January 2014.  The Ohio State University ("OSU") then leveraged the OSU Band's popularity and had Waters travel the country raising tens of millions of dollars for OSU's *But For Ohio State* campaign.

The court finds that, as a matter of law, by his own allegations Waters establishes that he is a limited-purpose public figure because he was drawn into the public controversy concerning the OSU marching band and, before being drawn into the controversy, he had attained a general notoriety and prominence in the community, as well as the general society.  *See Jankovic v. Int'l Crisis Grp.*, D.C.Cir. Nos. 14-7171, 14-7178, 2016 U.S. App. LEXIS 8552, at *9-10 (May 10, 2016) ("a court must be mindful that 'the touchstone' of the limited-purpose public figure analysis remains determining 'whether an individual has assumed [a] role[] of especial prominence in the affairs of society . . . [that] invite[s] attention and comment.'  *See Lohrenz*, 350 F.3d at 1279 (alterations in original) (quoting *Tavoulareas*, 817 F.2d at 773)").  The court further finds that this is not a circumstance where Waters gained notoriety because he sought redress of perceived wrongs in this court.  Waters' contention that a development of a factual record is required to determine whether he is a private or public figure is not persuasive.

{¶34} Because for purposes of this case Waters is a limited-purpose public figure, an actual-malice standard applies.  *See Total Exposure.Com., Ltd. v. Miami Valley Broad. Corp.*, 2d Dist. Montgomery No. 21062, 2006-Ohio-484, ¶ 81.  "In a

qualified privilege case, 'actual malice' is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." *Jacobs v. Frank*, 60 Ohio St.3d 111, 112, 573 N.E.2d 609 (1991), paragraph two of the syllabus. "Whether the evidence in the record supports a finding of actual malice is a question of law." *McKimm v. Ohio Elections Comm'n*, 89 Ohio St.3d 139, 147, 729 N.E.2d 364 (2000), citing *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 685, 109 S. Ct. 2678, 2694, 105 L. Ed. 2d 562, 587 (1989); *Spingola v. Sinclair Media, II, Inc.*, 10th Dist. Franklin No. 06AP-402, 2006-Ohio-6950, ¶ 9, citing *Harte-Hanks Communications, Inc.*, at 685. Thus, for Waters' to prevail on his defamation claims, the evidence in the record is required to show that, in issuing the alleged defamatory statements, OSU, through its agents, acted with knowledge that the statements were false or acted with reckless disregard as to their truth or falsity.

## *Defamation Claims Presented by Waters*

### a. OSU's Title IX Investigation Report

{¶35} In his complaint, Waters provides what he characterizes as a "Sample of the Falsities" in OSU's Title IX Investigation Report. (Complaint at 17.) Waters claims:

> (1) that a statement in the Title IX Investigation Report that "'Waters failed to take action to eliminate the harassment, prevent its recurrence, and address its effects'" is "false" (Complaint at ¶ 48);

> (2) that the phrase "under Waters' direction" in "'[i]n recent years and under Waters' direction, Midnight Ramp has been held immediately following Fesler Night, which is a semi-formal evening event where members learn about Marching Band

traditions and, according to one witness, take oaths not to tell about the Fesler'" is "false" (Complaint at ¶ 49);[3]

(3) that a statement in the report that "'[w]hen pressed specifically about the timing of this decision [to eliminate Midnight Ramp], Waters wavered on whether it occurred in May. Notably, Waters learned of this investigation on May 26, 2014, when he was told that it involved allegations of the Band's culture'" is "misleading" because it implies that a decision to eliminate Midnight Ramp was made in response to learning of the university's investigation (Complaint at ¶ 50);

(4) that a statement in the report stating that "'[o]ne witness stated that upper classmen subject new Band members to 'Rookie Midterms' on long bus trips that would contain written questions and physical challenges . . . . The witness provided a copy of the 'Rookie Midterm' that was used in 2011 with students who are still currently in the Band'" is "misleading" because the language suggests that Waters permitted the Rookie Midterms (Complaint at ¶ 51);

(5) that a statement on page 9 of the Title IX Investigation Report that Band members would prepare an underground newsletter named "Trip Tic" about anonymous members for away game trips is "misleading by its implication that Waters permitted this activity" (Complaint at ¶ 52);

---

[3]According to the Title IX Investigation Report, "Midnight Ramp" was described by witnesses as "a longstanding tradition involving Marching Band members wearing only their underwear marching into the football stadium through the ramp." (Exhibit C to OSU's Answer, at 4.)

(6) that the Title IX Investigation Report's discussion of the *Unofficial Ohio State Marching Band Songbook* is "misleading by its implication that Waters permitted this activity" (Complaint at ¶ 53);

(7) that a sentence in the Title IX Investigation Report that "'one witness stated that Waters texted dirty limericks to students. Waters acknowledged having cell phone numbers for squad leaders but denied ever texting dirty limericks'" is a "gratuitous sentence" and "misleading by its implication that Waters was lying about his denial" (Complaint at ¶ 55); and

(8) that the Title IX Investigation Report at page 20 misstates an interaction involving a band member who submitted a mid-term evaluation of Waters. (Complaint at ¶ 56).

{¶36} The court finds that Waters' "Sample of the Falsities" constitutes a line-by-line critique that disputes discrete findings or conclusions in the report. However, when determining whether a statement is defamatory, the words of a publication should not be considered in isolation. *Leadscope* at ¶ 79. Additionally, as noted in *Jahahn v. Wolf*, 10th Dist. Franklin No. 12AP-624, 2013-Ohio-2660, ¶ 14,

> Ohio law also follows the innocent construction rule with respect to defamatory statements, which provides that "if an utterance is reasonably susceptible to both a defamatory and an innocent meaning, as a matter of law, the innocent meaning is to be adopted." *Sweitzer v. Outlet Communications, Inc.*, 133 Ohio App.3d 102, 112, 726 N.E.2d 1084 (10th Dist.1999), citing *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 372 (1983). Thus, "[i]f a statement has more than one interpretation, it cannot be defamatory per se." *Murray v. Knight-Ridder, Inc.*, 7th Dist. No. 02 BE 45, 2004-Ohio-821, ¶ 31.

As Waters contends certain statements were misleading, the innocent construction rule applies such that purportedly misleading defamatory statements may not be considered defamatory per se. Moreover, notwithstanding Waters' characterization of his disputes

as a "Sample of the Falsities," these disagreements essentially challenge OSU's methodology and opinions as contained in the Title IX Investigation Report. *See Scott v. News-Herald*, 25 Ohio St.3d 243, 250, 496 N.E.2d 699 (1986) ("determination of whether an averred defamatory statement constitutes opinion or fact is a question of law" and adopting a totality of the circumstances test that involves at least four factors— specific language used, whether statement is verifiable, context of the statement, and broader context in which the statement appeared).

{¶37} The court agrees with the federal district court in the related federal action when it states:

> In systematic fashion, the Report sets forth witness statements and evidence regarding each category of Band misbehavior. The evidence is analyzed and the Plaintiff's own comments are quoted and considered. The applicable rules are laid out, and the Report's conclusions are explained. The Report recounts the Plaintiff's lengthy involvement with the Band since 1995 as a student member, graduate assistant, Assistant Director, and ultimately as Director. It recites a litany of lurid details of a sexually-charged atmosphere which permeated the Band for decades, much of which the Plaintiff does not dispute. The Plaintiff may contend that the Report makes an incomplete and sometimes incorrect factual presentation, mischaracterizes his level of knowledge or understates his efforts to change Band culture; he may contend that the facts do not support the inferences drawn and conclusions made by the Report. But ultimately the Plaintiff's contentions reflect his disagreements with the Report and its methodology.

*Waters v. Drake*, 105 F. Supp.3d 780, 802 (S.D.Ohio 2015) (granting judgment on the pleadings in favor of OSU and other defendants on Waters' due process claims).

{¶38} Upon review of Waters' "Sample of the Falsities" as to OSU's Title IX Investigation Report, the court determines that, when the "Sample of the Falsities" are read in the context of the entire Title IX Investigation Report, a reasonable reader would not interpret these statements as defamatory. Rather, the report confirms Waters' claim, namely, that he took steps "to change a negative culture that was built over many

decades." (Exhibit B to Answer.) Obviously, in view of OSU's dismissal of Waters, Waters' steps during his directorship to change the culture were not performed within a satisfactory time-frame or with a sufficient effect to satisfy university authorities. But OSU's dismissal of Waters does not convert OSU words or investigation into defamation. It is not the law in Ohio that an employee has a cause of action for defamation because the employee whose employment is terminated disagrees with an employer's written assessment of the employee's unsatisfactory job performance. *Compare Cooke v. United Dairy Farmers, Inc.*, 10th Dist. Franklin No. 02AP-781, 2003-Ohio-3118, ¶ 24 (setting forth the elements of a defamation claim). The Title IX Investigation Report does not suggest that Waters did nothing with regard to the band's culture; rather the report suggests that Waters' efforts to eliminate the offending aspects of the band's culture were not performed in a thorough and timely manner to satisfy his superiors. Indeed, notwithstanding Waters' efforts, some offending practices still continued such that the report urged university officials to, among other things, "Establish independent monitoring and review of information gathered and the steps taken to reverse an insular culture with external accountability," as well as "Take appropriate personnel action to address all concerns." (Exhibit C to Answer at 22-23.)

{¶39} The court also finds that the evidence in the record does not show that, in issuing the alleged defamatory statements in the Title IX Investigation Report, OSU, through its agents, acted with knowledge that the statements were false or acted with reckless disregard as to their truth or falsity so as to defeat OSU's qualified immunity with respect to the Title IX Investigation Report. Notably, in *Spingola v. Sinclair Media, II, Inc.*, 10th Dist. Franklin No. 06AP-402, 2006-Ohio-6950, ¶ 11, the Tenth District Court of Appeals indicated that where a statement has some basis in fact, actual malice may not exist, stating:

> As this court indicated in *Serv. Emp. Internatl. Union Dist. 1199 v. Ohio Elections Comm.*, 158 Ohio App.3d 769, 2004-Ohio-5662, 822

N.E.2d 424, at ¶ 24, where a statement is supported by some basis in fact, courts have found insufficient evidence of actual malice even if the statement is ultimately found to be untrue. Id., citing [*St. Amant v. Thompson*, 390 U.S. 727, 733, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)] (finding actual malice lacking where the defendant published a source's false statements about a public officer but the defendant had no personal knowledge that the statements were false, had verified other aspects of the source's information, and had affidavits from other sources substantiating the statements); *Flannery v. Ohio Elections Comm.*, 156 Ohio App.3d 134, 2004-Ohio-582, 804 N.E.2d 1032 (finding no malice where ultimately incorrect statements were published but the defendant had a factual foundation and an arguably rational basis for making the statements); *Mosley v. Evans* (1993), 90 Ohio App.3d 633, 638 (finding no malice where some factual foundation existed for statements). Likewise, the United States Supreme Court in *Bose Corp. v. Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 104 S. Ct. 1949, found clear and convincing evidence of actual malice lacking where the author's statement was one of a number of possible rational interpretations of an event that bristled with ambiguities. *Bose Corp.*, at 512, citing *Time, Inc. v. Pape* (1971), 401 U.S. 279, 290, 91 S. Ct. 633.

Based on his own statements as set forth in the record, Waters acknowledges that he was aware of the need for change in the band and he "began to reshape the culture" to address lingering issues. (Complaint at ¶ 26; see Exhibit B to OSU's Answer.) Construing these declarations in Waters' favor, these acknowledgements establish that the Title IX Investigation Report has some basis in fact such that actual malice does not exist with respect to the report so as to defeat a qualified privilege. OSU's contention that it is entitled to judgment on the pleadings with regard to Waters' defamation claims as to OSU's Title IX Investigation Report is well-taken.

### b. Dr. Drake's Comments

{¶40} Based on statements allegedly made by Dr. Drake in an August 13, 2014 press conference at the Columbus Metropolitan Club and comments made by Dr. Drake on August 21, 2014 to squad leaders of the marching band, Waters' alleges that "Dr. Drake's comments to the squad leaders show that his statements at the August 13th

press conference were misleading and false, and Dr. Drake acted with reckless disregard as to the truth or falsity of their statements." (Complaint at ¶ 46.) Waters asserts that Dr. Drake's statements constituted slander per se because his statements supported the Title IX Investigation Report, although he allegedly knew that the "factual statements" in the report were not true. (See Complaint at ¶ 103-106.)

{¶41} Waters alleges that at the August 13th press conference Dr. Drake stated that "'[r]eading the report, I was personally profoundly disappointed to see that there were reports that found that there were cultural problems in the band that needed to be addressed and we needed to move forward.'" (Complaint at ¶ 41.) According to Waters, at the August 13th press conference, "Dr. Drake publicly stated that the culture of the OSU band was one including '[b]ehaviors that would not be tolerated in any class or in any unit on our campus – and I dare say – not in any of your companies.'" (Complaint at ¶ 39.) However, Waters maintains that in an August 21, 2014 meeting with squad leaders of the band, Dr. Drake presented a different version.

{¶42} According to a transcript of proceedings transcribed from an audio recording of a "Confidential Meeting" held on August 21, 2014 with band leaders (Exhibit B to Waters' complaint), an unnamed "male speaker" remarked that he could not move forward, other people could not move forward, and the group could not move forward on the basis of a false and poorly conducted report. In response, Dr. Drake noted a belief that the report concerned people that neither he met nor that band members probably met, and that the members at the meeting represented OSU proudly and in a manner that the university could support. (Exhibit B at 20-21.) In response to an unnamed male speaker's claim that the OSU report was biased, Dr. Drake indicated that when he saw things that may have appeared "biased or tainted or sensationalized," he "discounted" those parts. (Exhibit B at 67.)

{¶43} Dr. Drake's comments to band leaders in a confidential meeting arguably may support an argument that OSU's Title IX Investigation Report may contain bias or

sensationalism, but Dr. Drake's comments should be considered with respect to their context and meaning. In 2 Dobbs, *The Law of Torts*, Section 404, 1131 (2001), the author notes, "The meaning of words raises a question distinct from their defamatory quality." "Courts tend to consider questions of meaning (as distinct from questions of defamatory quality) by taking into account (1) the words themselves, especially where the meaning is precise and standardized, together with reasonable implications; (2) the literary context, that is, the entire message; (3) the social context, that is, events, disputes, purposes of the communication and other factors outside the publication itself; and (4) the group feelings or culture of the recipients." *Id.* at 1132.

{¶44} Here, Dr. Drake was speaking to band leaders in a confidential meeting—for which 40 minutes were apparently allotted—after the band's director had been dismissed nearly a month earlier after leading the band to a successful season. (Exhibit B to Waters' Complaint, at 2-3.). From the context of Dr. Drake's remarks, it is manifest that Dr. Drake attempted to provide an explanation of his decision-making process related to a decision to dismiss Waters, while balancing the band leaders concerns.

{¶45} Upon review and taking into consideration the circumstances of Dr. Drake's comments on August 13, 2014 and August 21 2014, the court finds that, as a matter of law, Dr. Drake's comments, as alleged by Waters, do not constitute slander per se. *See generally McCartney v. Oblates of St. Francis deSales*, 80 Ohio App.3d 345, 353, 609 N.E.2d 216 (6th Dist.1992) (for an oral defamatory remark to be considered slander per se "it must consist of words which import an indictable criminal offense involving moral turpitude or infamous punishment, imputes some loathsome or contagious disease which excludes one from society or tends to injure one in his trade or occupation").

### c. Press Releases

{¶46} In his complaint, Waters alleges that an August 27, 2014 press release constitutes defamation, asserting at paragraphs 57 to 61 and paragraph 79:

57.    The disparagement was not limited to Dr. Drake and the Glaros Report [Title IX Investigation Report], but was also perpetuated by OSU Assistant Vice President, Media & Public Relations, Chris Davey, who launched false and incendiary remarks about Waters through press releases.  For example, Davey released an August 27, 2014 statement (the "August 27th Press Release") refusing Waters' request for a public name clearing hearing.  In that release, Davey omitted key pieces of information in further attempt to defame Waters.

58.    For instance, the August 27th Press Release states that "the report's basic conclusions about the specific complaints and the culture are not refuted by anyone," and then reiterated several of the flawed examples mentioned in the Glaros Report, including the Trip Tic, Song Book, and Rookie Midterms.

59.    Regarding the Trip Tic, the August 27th Press Release states that "the 'Trip Tic,' a newsletter with sexual content has not been denied." This statement is misleading by its implication that Waters permitted this activity.  He did not.  As discussed above - but intentionally omitted from the August 27th Press Release - Waters banned the use of the Trip Tic.

60.    Regarding the Song Book, the August 27th Press Release states that "the Songbook, with 124 different songs full of grotesque lyrics, has not been denied . . ."  This statement is also misleading by its implication that Waters permitted this activity.  As discussed above- but intentionally omitted from the August 27th Press Release – Waters banned the Song Book.

61.    Regarding the Rookie Midterms, the August 27th Press Release states that "Rookie Midterms and Physical Challenges with sexual content have not been denied."  This statement is also misleading by its implication that Waters permitted the Rookie Midterms and physical challenges. As discussed above - but intentionally omitted from the August 27th Press Release - Waters banned them as full-time Director. Yet, Davey intentionally excluded this information.

79.    The August 27th Press Release stated:

Jonathan Waters was not forthcoming or truthful with University personnel on multiple occasions….   The culture

created by these and other issues detailed in the university investigative report necessitated a change in leadership of the Marching Band…. [T]he report's basic conclusions about the specific complaints and the culture are not refuted by anyone:

>  Sexual nicknames, which Waters acknowledged were given to approximately fifty percent of Band members, and were "offensive" and improper, have not been denied;
>
> Tricks, sexually explicit and connected with nicknames, have not been denied;
>
> Rookie Introductions with sexual content have not been denied;
>
> Rookie Midterms and Physical Challenges with sexual content have not been denied;
> Trip Tic, a newsletter with sexual content has not been denied;
>
> The Songbook, with 124 different songs full of grotesque lyrics, has not been denied, and is included as Exhibit B to the report. Waters and his assistant director acknowledged that students were still singing such songs in September 2013;
>
> Other Bus Misconduct, including "flying 69s" and excessive sexual language in September 2013, has not been denied;
>
> Changing Clothes on Buses, has not been denied;
>
> Alcohol Abuse has not been denied;
>
> Verbal abuse and intimidation has not been denied.

***

The investigation determined that the former director was aware or reasonably should have known about this culture but failed to eliminate it, prevent is recurrence and address its effects.

These statements were misleading and false, and Davey acted with reckless disregard as to their truth or falsity.

And at paragraphs 80 and 81, Waters claims:

80. On September 26, 2014, Davey issued a press release stating:

Ohio State stands strongly behind the decision to terminate Mr. Waters. The hazing and harassment problems that were found to exist in the Marching Band during Mr. Waters' time as band director, and his more than 10 years as part of the band's leadership, were not reflective of what this University stands for or tolerates. Jon Waters concealed and shielded the significant cultural problems within the band and took it upon himself to take corrective action. Ultimately, whatever efforts he might have taken were incomplete and ineffective at protecting our students and failed to meet the standards this University has for those responsible for our students. And as such, the University took necessary action to eradicate those problems, including terminating the former director.

{¶47} These statements were misleading and false, and Davey acted with reckless disregard as to their truth or falsity.

81. On October 23, 2014, Davey issued a press release stating:

Mr. Waters ... knew the problematic culture of the band well, but failed to adequately or appropriately fulfill his obligation to meaningfully address the issues before him.

These statements were misleading and false, and Davey acted with reckless disregard as to their truth or falsity.

The court finds that Waters' contentions concerning the press releases essentially are unadorned OSU-unlawfully-harmed-me-accusations or claims containing legal conclusions couched as factual allegations. *See Sultaana v. Horseshoe Casino*, 8th Dist. Cuyahoga No. 102501, 2015-Ohio-4083, ¶ 12 (pleading standard in Civ.R. 8 does not require detailed factual allegations but it demands more than an unadorned accusation that a defendant harmed me). *Accord Waters v. Drake*, 105 F. Supp.3d 780, 788 (S.D.Ohio 2015) (Fed.R.Civ.P. 12(C) motion for judgment on the pleadings) ("A 'legal conclusion couched as a factual allegation' need not be accepted as true, nor are recitations of the elements of a cause of action sufficient"). As Waters' contentions about the August 27, 2014 press release mirror his contentions related to defamation that he raised about OSU's Title IX Investigation Report—contentions that the court has rejected as set forth above—the court finds that the portions of the August 27th press release cited in the complaint do not constitute defamation. The court further finds that the September 26, 2014 press release—as represented in paragraph 80 of the complaint—and the portion of the October 23, 2014 press release, as cited in paragraph 81 of the complaint, do not constitute defamation. Waters' claims of defamation related to these press releases essentially resolve to a disagreement with OSU's determination that his efforts to correct the band culture were incomplete and ineffective and that he did not adequately or appropriately fulfill an obligation to meaningfully address the issues before him.

### E. *False-Light Invasion of Privacy*

{¶48} Besides defamation claims, Waters presents a claim of false-light-invasion of privacy. In *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1229 (7th Cir.1993), the United States Court of Appeals for the Seventh Circuit noted,

> In tort law the term "right of privacy" covers several distinct wrongs. Using a celebrity's (or other person's) name or picture in advertising without his consent. * * * Tapping someone's phone, or otherwise invading

a person's private space. * * * Harassing a celebrity by following her too closely, albeit on a public street. * * * Casting a person in a false light by publicizing details of the person's life that while true are so selected or highlighted as to convey a misleading impression of the person's character. * * * Publicizing personal facts that while true and not misleading are so intimate that their disclosure to the public is deeply embarrassing to the person thus exposed and is perceived as gratuitous by the community.

In his complaint at paragraph 86, Waters asserts: "By issuing the Glaros Report [Title IX Investigation Report] and the subsequent statements by its employees, OSU placed Waters before the public in a false light, falsely suggesting that Waters ignored the alleged 'sexualized' culture of the OSU Band, failed to any action [sic] to address its effects, and other false statements detailed in this Complaint." Waters' false-light invasion of privacy claim thus places at issue whether OSU presented Waters in a false-light by publishing a description of him so as to convey a misleading impression.

{¶49} In *Welling v. Weinfield*, 113 Ohio St.3d 464, 2007-Ohio-2451, 866 N.E.2d 1051, ¶ 61, the Ohio Supreme Court recognized the tort of false-light invasion of privacy and adopted Restatement of the Law 2d, Torts, Section 625E. *Welling* holds: "In Ohio, one who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Id.* at ¶ 61. *Welling* notes, "False-light defendants enjoy protections at least as extensive as defamation defendants." *Id.* at ¶ 58. It follows therefore that the defense of a qualified privilege—that this court determined applies to Waters' defamation claims—may apply to Waters' claim of false-light invasion of privacy. *See DeGarmo v. Worthington City Schs. Bd. of Educ.*, 10th Dist. Franklin No. 12AP-961, 2013-Ohio-2518, ¶ 20 ("In this case, [the plaintiff-appellant] must prove that Worthington Schools

and the other defendants acted in reckless disregard as to falsity of the publicized matter in order to overcome the defenses of qualified privilege and to bring a claim of false light invasion of privacy claim").

{¶50} It has been observed that the core reasons that necessitated a dismissal of a defamation claim may inform the disposition of a false-light invasion of privacy claim. *See Murray v. Huffingtonpost.com, Inc.*, 21 F.Supp.3d 879, 888 (S.D.Ohio 2014) (on motions to dismiss a complaint alleging defamation and false-light invasion of privacy and applying Ohio law), citing *DeGarmo*, *supra*. In this instance, OSU had a legal obligation to give publication of the compelled investigation. Moreover, as set forth above, OSU's Title IX Investigation Report, Dr. Drake's comments, and OSU's press releases, as a matter of law, do not constitute defamation. Waters' false-light invasion of privacy claim hinges on his contention that, by issuing the Title IX Investigation Report and by subsequent statements by OSU employees, OSU placed him in a false light because OSU falsely suggested that he ignored the sexualized culture of the band and failed to address its effects. (Complaint at ¶ 86.) However, notwithstanding Waters' characterization, the Title IX Investigation Report, Dr. Drake's comments, and the OSU press releases suggest that Waters did not effect a sufficient change in the band's culture within a satisfactory time-frame—not that he ignored the sexualized culture in the band and failed to address its effects, as Waters suggests. The Title IX Investigation Report, Dr. Drake's comments, and the press releases were made in the discharge of a duty to investigate purported sexual harassment in the OSU marching band. Dr. Drake's comments and the press releases served to explain the Title IX Investigation Report and OSU's decision to terminate Waters' employment. Based on the pleadings and the exhibits attached thereto, the court concludes that, as a matter of law, a qualified privilege applies and serves as a defense to Waters' allegation of false-light-invasion of privacy.

## F. *Punitive Damages*

{¶51} In opposing OSU's motion for judgment on the pleadings, Waters "concedes that punitive damages are not recoverable against OSU." (Waters' Memorandum in Opposition to OSU's Motion for Judgment on the Pleadings at 38.) According to R.C. 3345.40(B)(1), punitive or exemplary damages generally are not to be awarded in an action against a state university or college to recover damages for injury, death, or loss to persons or property caused by an act or omission of the state university or college itself, by an act or omission of any trustee, officer, or employee of the state university or college while acting within the scope of his employment or official responsibilities, or by an act or omission of any other person authorized to act on behalf of the state university or college that occurred while he was engaged in activities at the request or direction, or for the benefit, of the state university or college. And in *Drain v. Kosydar*, 54 Ohio St.2d 49, 56, 374 N.E.2d 1253 (1978), the Ohio Supreme Court stated, "While the state has consented to be sued for the misconduct of its agents, it would appear that the General Assembly never intended that the state be held liable for other than compensatory damages."

{¶52} Upon review, the court finds that Waters' concession related to punitive damages is well-taken.

## IV. Conclusion

{¶53} For reasons set forth above, the court determines that the "Motion of Defendant The Ohio State University for Judgment on the Pleadings" filed on July 9, 2015 should be granted. The court further determines that judgment should be entered in favor of defendant The Ohio State University as a matter of law.

_____
PATRICK M. MCGRATH
Judge

[Cite as *Waters v. Ohio State Univ.*, 2016-Ohio-5260.]

| | |
|---|---|
| JONATHAN N. WATERS | Case No. 2015-00457 |
| Plaintiff | Judge Patrick M. McGrath |
| v. | <u>JUDGMENT ENTRY</u> |
| THE OHIO STATE UNIVERSITY | |
| Defendant | |

{¶54} For the reasons set forth in the decision filed concurrently herewith, the court GRANTS the "Motion of Defendant The Ohio State University for Judgment on the Pleadings" filed on July 9, 2015. Judgment is entered in favor of defendant The Ohio State University. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

 

 

                              _____

                              PATRICK M. MCGRATH
                              Judge

cc:

Peter E. DeMarco
Randall W. Knutti
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Caitlin E. Murphy
Michael H. Carpenter
Timothy R. Bricker
Special Counsel to Attorney General
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215

Jonathan N. Waters
201 Jay Court
Delaware, Ohio 43015

**Filed July 19, 2016**
**Sent to S.C. Reporter 8/5/16**